**JAMES BLACKSTONE MEMORIAL LIBRARY ASSOCIATION et al., Plaintiffs-Appellants,**

v.

**GULF, MOBILE AND OHIO RAILROAD COMPANY, Defendant-Appellee.**

No. 12430.

United States Court of Appeals
Seventh Circuit.
March 9, 1959.

Watson Washburn, New York City, Alfred W. Craven, Jr., Chicago, Ill., for appellant. Washburn & Gray, New York City, Notz, Craven & Price, Chicago, Ill., of counsel.

Kenneth F. Burgess, D. Robert Thomas, Walter J. Cummings, Jr., Arthur R. Seder, Jr., Chicago, Ill., for appellee. Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

Before MAJOR, PARKINSON and KNOCH, Circuit Judges.

MAJOR, Circuit Judge.

This action was commenced November 4, 1953, by former minority stockholders of Joliet & Chicago Railroad Company (herein called Joliet) against the Gulf, Mobile & Ohio Railroad Company (herein called Gulf), to whose subsidiary (Gulf, Mobile & Ohio Land Company) plaintiffs, on or about February 14, 1950, sold 4,312 shares of stock of Joliet at a price of $240.00 per share. The stock was so-called guaranteed stock, all of the property of Joliet (a railroad line between Joliet and Chicago) having been leased in 1864 to Chicago and Alton Railroad Company (herein, with successor corporations, called Alton), under a perpetual lease. This lease was assumed by Gulf in 1947 in connection with the Alton reorganization proceeding in the district court for the Northern District of Illinois.

The complaint sought damages of varying amounts up to the difference between $240.00 per share, the receiving price, and $1,087.70 per share, for total damages of $3,659,594.00. Plaintiffs' claim was based on Gulf's alleged stoppage of guaranteed dividend payments on plaintiffs' stock prior to purchase, and Gulf's failure, when purchasing plaintiffs' stock, to disclose material facts affecting its value in violation of Gulf's fiduciary obliga-

tions, by which Gulf was enabled to reap large profits at plaintiff's expense. Jurisdiction is asserted upon diversity of citizenship and upon a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b).

After formulation of the issues, the case was referred by Judge Philip L. Sullivan, on March 7, 1957, to Master in Chancery Augustine J. Bowe. Hearings were held before such master on May 21 and May 22, 1957, during which two witnesses testified for plaintiffs and five for defendant. The transcript of such testimony contains 287 pages. In addition, plaintiffs introduced in evidence depositions of four witnesses, and defendant, the depositions of five witnesses, such depositions comprising 517 pages, which by stipulation were introduced without being read, the special master having stated that he was acquainted with and would read them in detail. In addition, the parties introduced 74 exhibits, comprising 269 pages, making a total record of 1639 pages for consideration by the special master.

The report of the special master was filed December 13, 1957. It is set forth in its entirety in the appendix submitted by plaintiffs and comprises 150 pages. It reviews in great detail the evidence considered by the special master, including testimony heard by him, testimony submitted by depositions and the many exhibits introduced. Following this summary and based thereon, the special master made detailed findings of fact and entered his conclusions of law.

The findings and conclusions were adverse to plaintiffs and, in conformity therewith, the special master recommended to the court that a decree be entered dismissing the complaint for want of equity and that the cost, including master's fees to be determined by the court, be assessed against plaintiffs. Plaintiffs appropriately filed objections to the master's report and also objections to his certificate of fees and expenses. The court, after considering the briefs filed by the parties before the special master and also supplemental briefs filed by the

parties in support of and in opposition to plaintiffs' objections to the report, overruled all objections. The report was confirmed in all respects, and the findings of fact and conclusions of law of the special master were adopted as those of the court, which directed that a decree be entered in favor of the defendant, with the allowance of fees and expenses of the special master.

The court accordingly, on July 1, 1958, entered its decree in favor of defendant and allowed the sum of $8,000 as a reasonable and proper fee for services rendered by the special master, plus certain expenses incurred by him, and directed that such fee and expenses be allowed as taxable cost against plaintiffs. It is from this decree that plaintiffs appeal.

Plaintiffs in their brief state two contested issues: (1) whether defendant violated the fiduciary duties which it owed to plaintiffs when it purchased their stock and (2) whether the case was properly referred to a special master. Defendant acquiesces in the issues as stated by plaintiffs. Plaintiffs also state a third issue relative to the measure of damages, which obviously we shall not reach unless we reverse the holding of the district court that plaintiffs were not entitled to recover. We have read the voluminous summary of evidence, the findings of fact and conclusions of law contained in the special master's report and adopted, over plaintiffs' objections, by the district court. We have also read and studied the cases cited by the parties in support of their respective positions. The conclusion which we have reached obviates the necessity for more than a brief description of the factual situation.

Joliet, an Illinois corporation organized prior to 1862, issued a total of 15,000 shares of $100 par value capital stock, all of one class. In 1864, Joliet leased to Alton in perpetuity all of the former's real and personal property, including 37 miles of railroad between the cities of Joliet and Chicago. As rent under the lease Alton covenanted to guarantee and pay to the holders of Joliet's 15,000

shares of stock an annual dividend of seven percent upon the par value of the stock, or $7.00 per share, payable quarterly. The lease required Alton to make timely deposits with United States Trust Company of New York of sums sufficient to cover the dividends, the Trust Company to distribute such to the stockholders.

The lessee agreed that the sums of money to be deposited with the Trust Company "shall be free of all federal taxes which are now or may hereafter be levied by the Government of the United States, upon the payment of dividends declared or made upon the capital stock of incorporated companies, and that the dividend hereinafter provided to be paid in full and without any deduction therefrom for any Federal tax whatsoever upon the payment of said dividend, and that all taxes which may at any time hereafter be due to the United States Government on account of said dividends so paid from time to time shall be paid by the lessee to the United States Government."

The original lease was amended and supplemented in 1923 and 1939, by contracts between Joliet and Alton. By the supplemental contract of 1939, the original lease was amended so as to demise and lease to the lessee in perpetuity certain lands and property of Joliet not included in the original lease and described as follows:

"Also, all real and personal property hereafter acquired or constructed by the Joliet Company and wheresoever situated and in whatsoever form, including (without in anywise limiting or impairing, by the enumeration of the same, the scope and intent of the foregoing) all rights of · the Joliet Company in and to any and all property, real and personal, all tracks, buildings, bridges, viaducts, trestles, and other structures, leases, leaseholds, easements, licenses, permits, franchises, privileges, rights of way and rights of whatsoever description."

The 1939 supplement also amended the rental clause of the original lease by providing that no dividend should be payable on any Joliet shares which on any dividend payment date were registered on Joliet's books in the name of the lessee or in the name of any assignee of lessee's leasehold interest.

By a decree entered in the district court in Chicago on May 31, 1947, in the reorganization of Alton, Gulf assumed the lease, with all rights and liabilities provided in the original lease. The assumption agreement provided that the lease should be deemed a lease and not a conveyance in fee, and also that Gulf "reserves the right to obtain judicial construction of all tax provisions and to contest liability for the payment of taxes under the Joliet lease, and nothing herein contained shall be considered as a limitation upon or waiver of such right."

Between the time of Gulf's assumption of the lease and the purchase of plaintiffs' shares, Gulf had acquired a majority of the shares of Joliet.

While an element of damages, as alleged in plaintiffs' complaint, is based on Gulf's stoppage of guaranteed dividend payments on plaintiffs' shares, this contention is not pressed here. This is apparent from the fact, as already noted, that plaintiffs' sole contested issue, on the merits, is that Gulf violated its fiduciary duties toward plaintiffs when it purchased their stock. Plaintiffs do argue, however, that the activities of Gulf in connection with the stoppage of the payment of dividends is material as disclosing a preconceived plan to take advantage of the minority stockholders in the subsequent purchase of their shares.

In United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, the court held that Joliet was liable for an income tax on dividends paid directly to its shareholders by the lessee on the theory of constructive receipt. For some reason not discernible, it appears that following that case the legal advisors of Gulf decided that it was not liable for Federal income taxes on rental payments made to shareholders. Dividend payments were stopped, of which action shareholders were notified. The

Federal government filed a lien on such rental payments. Litigation ensued in the district court, in which it was decided that Gulf was liable for the tax. The case was appealed by Gulf to this court but afterward dismissed upon the purchase of plaintiffs' stock by Gulf. The purchase price of $240.00 per share included all rental payments which had been withheld by Gulf. The special master and the court below reviewed the facts in this connection and concluded that "those matters are not relevant to the issue in the present case as they had no effect upon plaintiffs' judgment when plaintiffs sold their Joliet stock in February, 1950, and plaintiffs were fully informed as to such matters before they sold their stock." With this conclusion we agree.

■ The real issue in the case arises from the alleged failure of Gulf to adequately inform plaintiffs of material facts which plaintiffs contend, if known by them, would have greatly enhanced the selling price of their shares. As to the duty of Gulf, the master found:

"As the defendant in February 1950 was the owner of substantially more than a majority of Joliet stock, there was a fiduciary relationship between defendant and the plaintiffs, minority stockholders of Joliet.

"This fiduciary duty required defendant in negotiating for the purchase of plaintiffs' Joliet stock to make complete disclosure of all material facts affecting the value of such stock before purchasing it from them."

The material fact which plaintiffs contend Gulf was under obligation but failed to divulge concerns the effort being made by Gulf, at the time it purchased the shares, to sell to the United States for Post Office purposes certain of the leasehold property located near Harrison Street in Chicago. After acquiring plaintiffs' shares and other shares held by the public, Gulf, pursuant to its intention announced in 1947, liquidated and dissolved Joliet later in 1950, thus terminating the

perpetual lease and simplifying its corporate structure. (The suggestion that this be done was made by Judge Barnes in the course of the Alton reorganization proceeding.) The sale to the United States, consummated in September, 1951, included a portion of the property formerly under the lease and, to a larger extent, other property which Gulf had acquired directly from Alton in 1947 under the latter's plan of reorganization.

The first contact which Gulf had with the Federal government relative to the sale appears to have been on November 4, 1949, when defendant's president called on the Postmaster General in Washington. The record is voluminous as to the activities of Gulf, its agents and attorneys, as well as representatives of the government, bearing upon the efforts of Gulf which culminated in a sale to the government in September, 1951 (some eighteen months after Gulf purchased plaintiffs' shares). The special master made a comprehensive review of the evidentiary facts bearing upon this issue. Although the evidence is not free from conflict, we are convinced that it furnishes ample support for the findings made by the special master, relevant portions of which are:

"92. Prior to February 10, 1950, GM&O had no knowledge or information that the government was giving Harrison Street property consideration more favorable than it was giving other Chicago sites proposed for acquisition by the government.

"97. Subsequent to February 10, 1950, and the acquisition by GM&O of plaintiffs' Joliet stock, GM&O continued its negotiations with the U. S. government authorities in its effort to sell the Harrison Street properties to the government. The negotiations continued with no definite commitment made by the government until October 5, 1950 when the government informed GM&O that it intended to acquire the Harrison Street property and would ac-

**450**

quire it by condemnation if negotiation did not result in an agreement on the price to be paid.

"109. The reason for not informing Joliet stockholders of the foregoing facts was that GM&O considered the management and disposal of the Harrison Street properties to be a problem for GM&O's management to handle, because the $7 dividend payable on Joliet stock would not be affected in any way as a result of a sale or other disposal of Joliet's interest in the Harrison Street properties.

"112. The correspondence between government officials contained in Defendant's Exhibit D–32 indicates that as of April 1950, they still had not come to any decision to purchase the Harrison Street property and that they were giving serious consideration to seven other sites in Chicago as suitable for purchase for Post Office use; that as late as June 7, 1950, they were giving consideration to sites offered by the Santa Fe Railroad and by a Mr. Tucker.

"115. Sale of the Harrison Street properties to the government was not assured until October 5, 1950, when the government representatives informed GM&O that the government had decided to acquire the property, either by negotiation or condemnation."

The case appears to have been tried in the district court on the theory that Gulf at the time it purchased plaintiffs' shares had an "assured" sale to the government of the leasehold property which was subsequently consummated. Thus, so it is argued, this "assured" sale was a material fact which Gulf by reason of its fiduciary position was under obligation but failed to make known to plaintiffs. The master having found, and we think properly so on the record, that there was no assured sale to the government (or anybody else) at the time Gulf purchased the shares, plaintiffs here contend that the question of an assured sale

is immaterial. They now argue they were entitled to be informed if the sale was "practically assured," "approaching consummation," "nearly completed," if there was a "reasonable possibility," even a "possibility," or if it was a "prospective sale." In our view, the most that can be said of Gulf's situation at the time it purchased plaintiffs' shares (February 14, 1950) was that it was anxious, as it had been for several years, to sell the Harrison Street property, and that it had hopes, perhaps with some reason, of consummating a sale to the government.

■■ The cases cited and relied upon by plaintiffs in support of their contention that Gulf concealed material facts in connection with its purchase of plaintiffs' shares are: Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853; Speed v. Transamerica Corp., D.C., 99 F.Supp. 808; D.C., 135 F.Supp. 176, affirmed 3 Cir., 235 F.2d 369; Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369, and Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798. These cases furnish support only for the proposition that majority stockholders of a corporation occupy a fiduciary relationship toward minority stockholders and, when purchasing their shares, are under an obligation to divulge all material facts. They furnish no support, and we are aware of no case which does, for plaintiffs' contention that Gulf under the facts and circumstances of this case was under obligation to inform plaintiffs of its desire to sell the Harrison Street property or that it hoped to sell such property to the government.

In Strong, the defendant, as agent for the corporation, had received a definite offer from the government, and the sale of the corporation's assets was assured before he purchased plaintiff's stock. More than that, plaintiff's shares were in a corporation which owned the property subsequently sold to the government. The Pepper and Lebold cases had nothing to do with the purchase of stock or disclosure of facts in connection therewith.

In Kardon, defendant, prior to purchasing plaintiff's shares, not only had received the offer for sale of its assets but had actually signed a contract for that sale on behalf of the corporation. In Speed (the main case upon which plaintiffs rely), the huge increase in value of the readily salable tobacco inventory of the company had already taken place and the operating earnings of the company greatly increased prior to the time of defendant's purchase of minority shares. While the sale or liquidation of the property did not take place until after such purchase, the huge profit was assured before the shares were purchased. It was information as to this vastly increased value of the inventory and earnings which the court held defendant was under obligation to divulge to plaintiff.

The Illinois decisions make a distinction between a situation where, at the time of the stock purchase, there is an assured sale at a price that enhances the value of the stock and a situation where only a possibility of sale exists. In Hooker v. Midland Steel Co., 215 Ill. 444, 74 N.E. 445, and in Bawden v. Taylor, 254 Ill. 464, 98 N.E. 941 (both cases cited with approval by this court in Chatz v. Midco Oil Corp., 7 Cir., 152 F.2d 153, 155), prior to purchase of the stock of the respective plaintiffs there had been discussions or negotiations looking to sale of assets of the corporations, and the sale was desired and intended but had not become assured at that time. Both cases held that the defendants were under no obligation to inform the plaintiffs of those circumstances. In Agatucci v. Corradi, 327 Ill.App. 153, 63 N.E.2d 630, the court held the rule to be different when a sale of property is assured at a price which would enhance the value of the shares. In that case, officers of the corporation had received a written offer for the sale of the assets, and immediately after purchase of plaintiff's stock the offer was accepted, thereby completing the sale. The court distinguished Hooker, Bawden and other cases. In connection with its holding that the defendants were under obligation to dis-

close, the court stated (327 Ill.App. at page 157, 63 N.E.2d at page 632):

" 'Special circumstances' such as an assured sale enhancing the value of the stock, known to the officers but not to the stockholder and not ascertainable from the books, modify the 'mere failure to disclose' doctrine."

On the following page the court further stated:

"We think this case presents an 'assured sale' case with the facts known to Corradi and Petronio and wrongfully held by them from plaintiff in violation of their trust."

Another factor which distinguishes this case from all cases relied upon by plaintiffs and which, in our view, is fatal to plaintiffs' contention, is their lack of all proprietary interest in Joliet. This is by reason of the fact that by the lease all of Joliet's property was demised in perpetuity. It was not and never had been an operating railroad. It had no assets, no income, no chance for capital gains or losses, and no liabilities. Its corporate existence was more fictional than real. It was a corporate shell and nothing more. Even the consideration for the lease flowed directly to the shareholders in the form of guaranteed payments characterized by them as dividends, by the lessee as rentals.

The effect of the lease upon the proprietary rights of Joliet and incidentally its shareholders has previously been considered by this court, as well as the Supreme Court of Illinois. In Joliet & C. R. Co. v. United States, 7 Cir., 118 F.2d 174, 176, this court stated:

"Thus, there is little, if any, question that the indenture of 1864 divested the plaintiff of all right, title and interest in the property, and vested a full and indefeasible title in the grantee, its successors and assigns."

In support of this statement we cited Huck v. Chicago & Alton Railroad Co., 86 Ill. 352, 354, and Chicago, Burlington & Quincy Railroad Co. v. Boyd,

118 Ill. 73, 7 N.E. 487. In Huck, the court considered the same lease involved here; in Burlington, the same form of lease but between different parties. It is true Joliet was reversed in United States v. Joliet & Chicago Railroad Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, upon a basis not material here; however, the Supreme Court left undisturbed the construction which we placed upon the lease. In fact, the court recognized the contention of Joliet which had been urged upon this court, by stating (315 U.S. at page 46, 62 S.Ct. at page 444):

"Respondent [Joliet] urges, and the court below held, that this so-called lease in perpetuity without a defeasance clause divested respondent of all right, title and interest in the property and vested a full and indefeasible title in the grantee."

Plaintiffs, apparently in an effort to avoid the construction heretofore given the lease, point to the provision in the assumption agreement by Gulf in the Alton reorganization proceeding that the lease should be deemed a lease and not a conveyance in fee. It is not discernible how this provision altered a situation which had been in existence and recognized by the parties for almost a century. Gulf, as had its predecessor lessees, took all of Joliet's property in perpetuity. In any event, Joliet shareholders still were entitled to receive $7.00 per share annually and nothing more.

As already noted, the special master found that the $7.00 dividend payable on Joliet stock would "not be affected in any way as a result of a sale or other disposal of Joliet's interest in the Harrison Street properties." Further, the special master concluded:

"Joliet stockholders, in the event of a sale of part of Joliet's property during the term of the lease, would derive no benefit from such a sale, even though made at a great profit, because their dividend was limited to $7 per share."

Certainly the fact thus found is unassailable, and we think the conclusion is sound. Expert witnesses for both sides so testified. Mr. Harold Gardner, an experienced lawyer of New York City, who had long represented some of the plaintiff shareholders and who took part in the negotiations which led to the sale of the shares in controversy, was a witness for plaintiffs. He testified that the proceeds in case of sale of the leasehold property by Gulf would go to it and not to Joliet stockholders, to remain in the treasury of and to be held by Gulf as a guarantee of the $7.00 per share rental payments. He testified that plaintiffs' shareholders would have received no part of the proceeds even if Joliet and Gulf had joined in a sale of the property. He further testified that Gulf under the terms of the lease had the right to lease or sublease the property either in perpetuity or for a shorter term, and that in such event Gulf would have been entitled to all rents and profits. Defendant's witness, Mr. Edward B. Hall, an investment banker and formerly president of the Investment Bankers' Association of America, testified to the same effect and pointed out that the stockholders of a leased line give up all interest in the growth and development of the company in return for a guaranteed income and that leased line securities are, in effect, bonds rather than stocks.

Thus, the situation of plaintiffs as shareholders of Joliet was in marked contrast to that of shareholders in the ordinary case who own the corporate assets subject to its liabilities, and where any enhancement of the value of the corporate assets results in a pro-rata increase in the value of their shares.

■ We do not understand that plaintiffs attach any importance to the remote possibility that the leasehold property might revert to Joliet. Such contention, if made, would have no validity in view of a long line of Illinois decisions in condemnation cases holding that the possibility of reversion after a long term lease was not to be considered in determining market value of property. Chicago West Division Ry. Co. v. Metropolitan West Side Elevated R. Co., 152 Ill. 519, 525, 526, 38 N.E. 736; Chicago &

# 453

Northwestern Ry. Co. v. Chicago Mechanics' Institute, 239 Ill. 197, 222, 87 N.E. 933, and Aldrich v. R. J. Ederer Co., 302 Ill. 391, 397, 134 N.E. 726, 729. In the latter case, the court held that if a taking of a portion of property held under long term lease materially affects the security for rents payable to the lessor, the lessor still has "no property right in such fund [the condemnation award], but may require its use in such a manner as to protect their [lessor's] lien." No suggestion is made here that the sale by Gulf of certain of the leasehold property impaired its guarantee to make dividend or rental payments to plaintiffs as shareholders of Joliet. Obviously, such a contention would be without merit because Gulf, after its sale to the government, still possessed the most important portion of the leasehold property, which included 37 miles of railroad right-of-way between the cities of Joliet and Chicago, including entry into the latter city.

Plaintiffs do not dispute but that the amount paid by Gulf for their shares ($240.00 per share) was as much or even more than their fair market value. Mr. Gardner conceded that "he could not imagine any investor being willing to buy Joliet stock on a yield basis at a price of $240.00 per share." Plaintiffs' asserted right to recover, however, is based upon the premise that if they had known of the impending sale to the government by Gulf, they would have been in a better "bargaining position," that is, they could have demanded and compelled Gulf to pay a higher price. Plaintiffs thus seek to recover not because of any injury which they sustained by the sale of their shares but on the basis that a benefit inured to Gulf. In other words, their shares possessed a "nuisance value," for which they were entitled to be compensated. In fact, plaintiffs go to the extreme position of asserting that they are entitled to share pro-rata not only in profits realized by Gulf on its sale to the government but in tax benefits which accrued to Gulf by reason of the transaction.

Plaintiffs' contention ignores the severe limitation which the lease in perpetuity placed upon their shares. Their proprietary rights were confined to a guaranteed dividend or rental of $7.00 per share. Their theory is not supported by any case of which we are aware and we think it is unsound. The fallacy of plaintiffs' position is illustrated by Speed v. Transamerica Corp., D.C., 99 F.Supp. 808, upon which plaintiffs principally rely and which we have heretofore discussed. In that case, if plaintiffs had not sold their stock, as full equity owners of the property they would have been entitled to share in the proceeds of the sale or in the reinvestment thereof. In contrast, plaintiffs as shareholders in Joliet had no right to share in the proceeds of the sale by Gulf to the government or in any income derived from the investment of such proceeds. We think it hardly conceivable that the court in Speed would have reached the result it did if the plaintiff shareholders in that case had been limited in their rights as they are here.

■ The court of its own volition referred the case to a special master. Plaintiffs argue that the reference was improper and that the entire cost of the reference should be borne by defendant. There may be a question as to whether this was a proper case for reference, but on the record we cannot hold that the action of the court was erroneous. Plaintiffs state that in open court on more than one occasion they objected to the reference. This appears to be an overstatement because at no point did they object. The most that can be said is that counsel indicated a preference for a court trial, although conceding that it might properly be referred on the issue of damages. No question is raised but that the fees which the court fixed for the special master are reasonable. Under the circumstances, we would not be justified in altering or modifying the decree as it relates to costs.

Plaintiffs argue other issues, subsidiary in nature, which we have consid-

ered but find unnecessary to relate or discuss.

The decree of the district court is Affirmed.