Albert A. LIST, Plaintiff,

v.

FASHION PARK, INC., et al.,
Defendants.

United States District Court
S. D. New York.

Feb. 13, 1964.

See also D.C., 222 F.Supp. 298.

O'Brien, Driscoll & Raftery, New York City, Edward C. Raftery, Arthur F. Driscoll, Milton Rosenbloom, New York City, of counsel, for plaintiff.

Nixon, Hargrave, Devans & Dey, Rochester, N. Y., Frederick W. C. Mc-Nabb, Jr., Rochester, N. Y., of counsel, for defendant Fashion Park, Inc., et al.

Leonard I. Schreiber, New York City, for defendant Lerner.

Baer, Marks, Friedman & Berliner, New York City, William E. Friedman, New York City, of counsel, for defendants Hentz and William P. Green.

COOPER, District Judge.

This is an action for damages based upon an alleged violation of the Securities Exchange Act of 1934 and Commission Rule X–10b–5.

Plaintiff List seeks to recover $160,650. He bases his claim on the difference between the price ($18.50) at which he sold 5100 shares of Fashion Park, Inc., stock on November 17, 1960, and the price ($50.00) at which Hat Corporation of America, on December 7, 1960, pursuant to an acquisition agreement, offered to pay for shares of Fashion Park.

List sold the 5100 shares to Hentz & Co. (hereinafter "Hentz"). Hentz, as broker, purchased 400 of these shares for defendant William P. Green and his daughter, 400 for Beaver Associates and 4300 for defendant Louis Lerner. The 5100 shares had been purchased by plaintiff on January 29, 1959 for $13.50 a share. His profit was $25,500.

The sale originated November 16, 1960, when plaintiff's broker, Textile Shares Corporation, acting through Roy Robinson, telephoned Hentz, stated he had seen Hentz in the National Quotation Bureau "sheets", and inquired if Hentz would buy a block of about 5000 shares of Fashion Park at $20. Hentz, dealing through defendant Green, replied that he had an order to buy only 400 shares but agreed to try and place the block offered. The 400 share order was from Beaver Associates. On November 16, 1960, Green telephoned Lerner and was informed by the latter that he would not pay more than $17.50 and that he had refused a

large block offered at over $19 a share shortly before.

The next day and several telephone calls later, a price of $18.50 was agreed upon, and the shares sold. Green knew Lerner was a director of Fashion Park. So too did plaintiff and his broker.

Of the 4300 shares purchased by Lerner, also a broker, 1163 were retained for his own investment account, and the remaining 3137 shares were promptly resold at a small profit ranging from 17 cents to $1.50 a share.

In accordance with usual brokerage practice at the time of the sale, Green did not know the name of the seller and Robinson did not know the name of the buyer. List at no time inquired as to the identity of the buyer.

In January, 1959 when List, an experienced investor and chief executive officer of Glen Alden Corporation, purchased 5100 shares of Fashion Park, he knew that absolute control of Fashion Park was held by certain members of the Rosenberg family, (among defendants here) who owned over 30,000 shares out of some 59,000 shares of the corporation's outstanding common stock. At that time, plaintiff and his broker Robinson were also aware that Fashion Park, a manufacturer of men's clothing and the operator of a chain of men's retail stores, had not been doing well for several years; that the market value of the stock ($13.00) was substantially less than its book value ($56.00); and that the Rosenbergs had indicated their unwillingness to sell out or merge the business.

Plaintiff also conceded at the trial that he neither knew nor cared whether the persons whose stock he purchased were insiders of Fashion Park, and that his broker made no inquiries on this subject.

Notwithstanding their knowledge of the declared opposition by the Rosenbergs to a sale or merger, plaintiff, in February of 1959, asked Robinson to get information as to whether the Fashion Park business could be bought. Although Robinson reported back that the Rosenbergs were not interested in selling, Robinson apparently continued his efforts to reach the principals of Fashion Park. In April or May of 1960, Harold P. Seligson telephoned Robinson and expressed an interest in bringing about a merger involving Fashion Park. Robinson gave Seligson a proxy for the May, 1960 Fashion Park annual meeting and kept in communication with him thereafter.

Prior to the trial of this action, Seligson and List had neither met nor ever spoken to each other. Seligson was not representing List, and just prior to plaintiff's sale of his Fashion Park stock in November, 1960, plaintiff had never even heard of Seligson.

Similarly, Seligson never told anyone, including the people at Fashion Park, that he was in any way acting on behalf of plaintiff, and as far as the officers of Fashion Park were concerned, Seligson was acting on his own behalf. Seligson's role, by his own admission, was that of an outsider seeking to earn a finder's fee for bringing about a merger involving Fashion Park. In this role, he attended the Fashion Park annual stockholders' meeting in May, 1960, spoke by telephone with Rosenberg, Jr., president of the corporation, at the offices of Fashion Park in Rochester, New York, on October 24, 1960, and at other times, and corresponded with Rosenberg, Jr., on several occasions.

In these communications, it was obvious to Rosenberg, Jr., that Seligson's purpose was to "intrude into our business in the hope that * * * he would either get a finder's fee or be paid something by Robinson, who was the only name that he ever mentioned to me that he represented." (Transcript of Record, 101.) It must also be noted that in his communications, Seligson neither made any bid for Fashion Park stock nor did he quote a price.

It was in this frame of reference and acting on the advice of counsel that Rosenberg, Jr., wrote to Seligson on October 31, 1960 stating that Fashion Park was not interested in selling its business and that "you have not had and do not

have any authority from us to confer with Mr. Robinson or any other person or firm with respect to our company." (Plaintiff's Exhibit 5.) This positive position was reiterated in a further letter sent by Rosenberg, Jr., to Seligson on November 10, 1960.

Notwithstanding the stricture contained in Rosenberg's letters, Seligson promptly communicated their contents to Robinson, who in turn informed plaintiff thereof.

Plaintiff had long known that a majority of Fashion Park's stock was owned by management, that the stock was not listed and was not dealt in generally by the public, and that management was unwilling to sell. However, confirmation by Rosenberg, Jr. of management's unwillingness to sell is alleged by plaintiff to have triggered his sell order.

During the period when Seligson was attempting to deal with the principals of the corporation, certain events were transpiring at Fashion Park. In May, 1960 defendant Lerner, who together with members of his family and an investment company (in which he had a 30% interest) held stock and debentures in Fashion Park (then worth approximately $100,000.00), was elected to its Board of Directors. At a meeting of the Fashion Park Board held on May 16, 1960, Lerner proposed that it would be advisable for the corporation to look into the possibility of a merger or sale as an alternative to suggested plans for rearranging bank loans or negotiating new factoring agreements to meet rising financial obligations. However, this suggestion was opposed by the Rosenberg family, whose representatives on the Board of Directors reiterated their firm position against such a move, and it was never mentioned again by Lerner.

Early in September, 1960, Abraham Chatman, manager of the Rochester Joint Board, Amalgamated Clothing Workers of America, conferred privately with Rosenberg, Sr. Chatman stated that he wished to take away a substantial number of employees from Fashion Park since there was not enough full time work available, and that he was trying to interest another manufacturer to operate in Rochester and use these Fashion Park employees. Chatman repeated this to Rosenberg, Jr. on October 4, 1960.

On October 7, 1960, Rosenberg, Jr. telephoned the three out-of-town directors of Fashion Park, including Lerner, and told them Chatman's position. Three days later, Lerner called Rosenberg, Jr. and suggested that the company retain a labor lawyer to combat the threatened action by the union. On about November 1, 1960, Rosenberg, Jr., at the suggestion of counsel to the company, called a directors' meeting for November 4, 1960 to consider the union's threat. At that meeting Chatman was present and again reiterated his position concerning the prospective removal of 300 to 350 Fashion Park employees. Chatman also indicated to the Fashion Park Board that he had someone in mind interested in buying Fashion Park, but he withheld the name. He also admitted that he had no knowledge concerning any possible price or terms of sale.

Following receipt of this information, and at that same meeting, the Fashion Park directors adopted a resolution to the effect that the company seek to negotiate its sale or merger. As was testified to by Rosenberg, Jr., the resolution was adopted because the union was putting "a gun to my head." (Transcript of Record, 70.) The Rosenbergs continued to entertain genuinely the hope that the sale of the company could be averted, and as they saw it, the resolution was adopted in order to satisfy Chatman temporarily and gain time to resolve the ultimatum by a different course. On November 11, 1960, Rosenberg, Jr. delivered a copy of the resolution to Chatman.

On November 14, 1960 Chatman privately told Rosenberg, Jr. that his prospective purchaser was the Hat Corporation of America (hereinafter "Hat Corporation"). No one else was present at this meeting; defendant Lerner was not informed thereof.

On November 16, 1960, Robinson telephoned Hentz and offered List's shares for sale. On November 17, 1960 Robinson sold the 5100 shares to Hentz for $18.50 per share. At that time representatives of Hat Corporation had not even met the principals of Fashion Park. Certainly by that date they had not offered to purchase the stock of Fashion Park.

On November 22, 1960, the principals of both companies met in New York City —Rosenberg, Jr., for Fashion Park, Bernard Salesky for Hat Corporation. At the meeting, an extended discussion on the financial condition of Fashion Park took place and Fashion Park officers arranged to have its accountants furnish additional financial information to Hat Corporation. It is significant to note that when during that meeting Salesky expressed the thought that Fashion Park was worth $1,000,000 less than its book value, a Fashion Park officer emphasized that the business was not on the auction block.

A further meeting was arranged for December 1, 1960 in Rochester, at which time Salesky was to indicate whether or not he was interested in making an offer for the purchase of Fashion Park.

At the December 1 meeting, Salesky offered $50.00 per share for Fashion Park common stock. Considering the Rosenbergs' reluctance to sell their Fashion Park stock, it was suggested that they would need time to consider the offer. It was not until December 4, 1960, 17 days after plaintiff sold his stock, that Rosenberg, Jr., telephoned Salesky that the Rosenbergs would be willing to work with him on that basis. It was only then that Rosenberg, Jr., informed the out-of-town directors, including defendant Lerner, of the meetings with Salesky and of the decision reached by the Rosenberg family. Thereafter a preliminary memorandum of agreement was signed on December 7, 1960, and on the same date an announcement was made to the press.

Negotiations with respect to the proposed transaction continued until a for-mal agreement, signed on February 3, 1961 and amended on March 7, 1961, was consummated.

Between the dates of the preliminary memorandum of agreement and the final agreements, the parties reached an impasse which for a time threatened to block the proposed sale. On December 6, 1960 a preliminary agreement was handed out by Hat Corporation which specified that the purchase price of Fashion Park stock was predicated on its net worth of $3,400,000 as of November 30, 1960. Hat Corporation stated that if the book value was less on that date, demand would be made for an adjustment in price. This position was reiterated the following day in Rochester when the preliminary agreement was brought for signature.

In fact, at a meeting held in New York City in January, 1961 for the purpose of preparing the final agreement, Salesky took the position that if Fashion Park's net worth was less than $3,400,000 on November 30, 1960, there would be no sale. An argument ensued and Fashion Park representatives concluded that Salesky was either attempting to call off the sale or arrange a lower price. At that point, Fashion Park representatives walked out of the meeting.

Thereafter these difficulties were ironed out and the final agreement executed. Nevertheless, the fact remains that as late as January, 1961 no agreement between Fashion Park and Hat Corporation had been reached, and there existed the strong possibility that agreement would not be reached at all.

Plaintiff commenced the instant action February 24, 1961 at the instigation of his broker Robinson who admits to a financial interest in any recovery—a commission for his efforts addressed to the institution of the instant claim. He proposes to charge $5000 for both those efforts and his testimony in the case, but only if plaintiff succeeds; he plans to give Seligson 20%. As already indicated, Robinson and Seligson worked closely together to achieve the objective that ap-

pealed to both, and Seligson has yet to be paid. This objective, to sell or merge Fashion Park, has eluded both. Failure, and its consequent loss of fee, left both men disgruntled—an attitude which they were unable to dispel even as late as the trial date.

Plaintiff contends that defendants conspired to buy his stock and resell it at a substantial profit; that Lerner, a director of Fashion Park, had material information which if revealed to plaintiff would have affected the price at which plaintiff would have sold his stock; that defendants' failure to communicate these "facts" to plaintiff constituted a breach of defendants' duty to him, a minority stockholder, and consequently defendants are liable under Rule X–10b–5 for his loss of further profits. The claimed material facts alleged to have been withheld are:

1. That Lerner was the buyer of all or part of plaintiff's stock.

2. That prior to November 17, 1960, the stock of Fashion Park was selling at a discount from its book value largely because the controlling stockholders refused to replace its management or to sell out their interests, or to merge or reorganize.

3. That the situation of Fashion Park and of the Rosenbergs had become critical prior to November 4, 1960, largely because of threats by the labor union to remove 300 to 350 employees.

4. That an important change in that situation had taken place when the board of directors of Fashion Park on November 4, 1960 adopted a resolution to the effect that the company must be sold or merged.

5. That Hat Corporation was interested in Fashion Park and had expressed such interest a considerable period of time before November 17, 1960.

These contentions are urged not only against Lerner but also as to Hentz and Green. Any knowledge attributable to Hentz is based solely on the alleged knowledge of Green, the only person acting on behalf of Hentz in the transaction which underlies this suit. Plaintiff claims that Green derived his information from defendant Lerner only. This is corroborated by Fashion Park witnesses who testified, without contradiction, that they had no contact whatever with defendants Hentz or Green.

■ If plaintiff can establish the alleged facts, show they were unknown to him when he made his sale, and prove that had they been made known to him they would have affected his sale, he must recover. Rules 10b and X–10b–5 prohibit insiders such as directors from using their superior knowledge to profit at the expense of uninformed shareholders. The purpose of these rules was defined in Speed v. Transamerica Corp., 99 F.Supp. 808, 828–829 (D.Del.1951):

"It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction."

As to the first of the five contentions advanced by plaintiff: that he would not have sold had he known Lerner was the buyer, or that brokers, who were also directors, had been bidding for the stock. Yet plaintiff placed no restrictions on Robinson with respect to the sale of his stock other than price.

After checking the rising price of Fashion Park stock in the National Quotation Bureau's "sheets", Robinson advised List between November 10 and 15,

1960, "to get out of it at a nice profit." (Transcript of Record, 193–194.) Robinson suggested that five points over the buying price would be a "nice" profit. To this plaintiff agreed and authorized sale at $18 net.

Although Robinson admitted that usually a broker with a "sell order" calls all the firms listed in the sheets to get the best price, he first denied doing so, saying he relied on Hentz. Ultimately Robinson admitted calling between November 7 and 10, 1960, two other brokers in the sheets, Rice and Williams, as well as Caughlin, a broker who was then a director of Fashion Park. But he received no bid for the stock.

Plaintiff never restricted Robinson in selling by forbidding sale to a director. He neither thought such restriction important nor did he ask Robinson to check whether any director was bidding in the sheets.

Robinson knew two directors, Lerner and Caughlin, were bidding. He himself had offered the stock to Caughlin, a director. None of this however adversely affected Robinson's judgment to sell at a five point margin.

■ List has failed to prove by a fair preponderance of the credible evidence that had he known Lerner was a buyer of his stock, he would not have sold. Accordingly, the Court finds that Lerner's identity was not a material fact.

In his second contention, List claims he should have been told by defendants that Fashion Park stock was selling at a discount largely because the Rosenbergs refused to give up their interests.

The record clearly discloses that List knew Fashion Park was selling at a discount when he sold his stock on November 17, 1960. A discount situation is created when the market price of a stock is considerably below the book value of the stock. List knew of the disparity in prices when he bought his Fashion Park stock and he admitted that the book value had not changed since his purchase in January, 1959. Since the market price had not increased considerably, he knew that the discount situation still existed.

List also knew that management was reluctant to sell a business which had been in the family for decades. He admitted hearing from Robinson early in 1959 that the Rosenbergs would not sell. There are no facts relative to this aspect of the case of which plaintiff was unaware.

Plaintiff's third contention is that the critical situation at Fashion Park precipitated by threats of the union to remove 300 to 350 employees was unknown to him, and that knowledge of these facts would have affected his decision to sell.

The Court cannot accept the claim that knowledge of this information would have discouraged the sale of stock. The fact that the company, already in difficulty, was threatened with the loss of a substantial part of its labor force could only be viewed as an adverse development. It has already been established that List's motive in selling the stock was the potential five point profit. Deteriorating conditions within the company would not have discouraged a sale where the desired margin of profit was assured. These facts could only have encouraged the sale at that price.

■ We agree with the characterization of this contention, "a makeweight, is cumulative, and is not really material." List v. Fashion Park, Inc., 222 F.Supp. 798, 801 (S.D.N.Y.1963).

Now the fourth contention: Plaintiff's unsupported and subjective assertion that had he known of the November 4, 1960 resolution of the Fashion Park Board of Directors he would not have sold his stock, ignores the undisputed facts and circumstances leading up to the adoption of that resolution. The uncontroverted evidence establishes that the Fashion Park Board acted not with the desire or intention to sell or merge the business, but with the hope of delaying the implementation of Chatman's threat to remove one third of Fashion Park's factory employees. Further, at

the time that resolution was adopted, the directors of Fashion Park had only the statement by Chatman that some unknown party might be interested in the company. It was not known who was interested; there was no mention of price; there was no pending transaction.

The Court is convinced that in light of decades of operation and pride of accomplishment, the Rosenbergs exercised the greatest reluctance in giving up their enterprise. The resolution of November 4, 1960 did not change their intention to retain the business if at all possible.

The fact is that when the resolution was adopted, there was no assurance or even expectation that a sale or merger of the business, which had been poor for several years, could have been negotiated on terms favorable to the stockholders before the union carried out its threat with disasterous consequences resulting to Fashion Park.

Lerner, who then had an investment of about $100,000 in Fashion Park, did not regard the resolution as favorable; he proposed getting a labor lawyer to fight the union. Only after it was reported to the meeting that such a step would be futile was the resolution adopted. In short, the resolution was born out of desperation without the least hope or promise of profit or benefit to Fashion Park or its stockholders.

Even if the company had not been faced with such adverse developments, mere willingness to sell or merge, absent an agreement for sale or even negotiations therefor, is not a material fact. James Blackstone Memorial Library Assn. v. Gulf, Mobile & Ohio R. Co., 264 F.2d 445 (7th Cir. 1959).

The Court, in the Blackstone case, was unaware of any case which supported plaintiff's contention there that defendant "was under obligation to inform plaintiffs of its desire to sell the Harrison Street property or that it hoped to sell such property to the government." 264 F.2d, at 450.

More recently, the reasoning in the Blackstone case was affirmed in Kohler v. Kohler Co., 208 F.Supp. 808 (E.D.Wis. 1962), aff'd, 319 F.2d 634 (7th Cir. 1963). Absent actual negotiations or even knowledge of the identity of any possible purchaser, a mere willingness or possibility of sale has not been found to be a material fact under 10b and X–10b–5.

In calling this resolution a material fact, plaintiff relies on Speed v. Transamerica Corp., supra, and Kardon v. Nat'l Gypsum Co., 73 F.Supp. 798 (E.D. Penn.1947). In Speed, minority shareholders collected damages when majority holders, also directors, purchased Axton-Fisher Co. stock from them without disclosing plans to liquidate a large inventory of the company's tobacco which was worth far more than its book value.

That case, however, is inapposite since the increase in value of the tobacco had already taken place at the time the directors bought the minority shares, and the profit had already been assured. In the case at bar, there was only an expressed desire to remedy a deteriorating labor situation. When List sold his stock on November 17, 1960, no one knew whether there would be a sale of Fashion Park and whether the sale if consummated would be profitable to shareholders. The profit was assured on February 1, 1961, when the final agreement was signed.

In Kardon, negotiations had already begun for the sale of the property and both sides had entered into an agreement of sale prior to the date on which defendants purchased plaintiffs' stock.

■ Factually, and as a matter of law, the November 4, 1960 resolution was not a material fact which should have been disclosed to List.

Plaintiff's final assumption that Hat Corporation showed an interest in Fashion Park prior to the date of plaintiff's sale and that such interest was known to the defendants, is not supported by the record. The only contact between buyer and seller covering the period prior to November 17, 1960 was the November 15 call from Salesky, president of Hat Corporation, to Rosenberg, Jr., to set a

date and place for a meeting. The first meeting of the principals of the two corporations was on November 22, 1960, five days after List's sale.

■ No proof was offered at the trial to show that any defendant knew about the telephone call between Salesky and Rosenberg, Jr., which antedated List's sale. Indeed, Rosenberg, Jr. testified that he did not tell the out-of-town directors about Hat Corporation until December 4, 1960, almost three weeks after plaintiff sold his stock. Accordingly, no material fact on this score was known to the defendants which they could have disclosed to List.

■ Plaintiff has failed to show the existence of a material fact which, if known to him, would have affected his sale. Additionally, he has failed to prove that he relied on any statement or omission, act or practice of a defendant. The element of reliance has not been read out of 10b and X–10b–5. Connelly v. Balkwill, 174 F.Supp. 49 (N.D.Ohio 1959), aff'd, 279 F.2d 685 (6th Cir. 1960); Mills v. Sarjem Corp., 133 F.Supp. 753 (D.N.J.1955); III Loss, Securities Regulation, 1765 (2d Ed. 1961).

Because there was no contact between List and defendants, and no statements were made by them to him, his alleged reliance would have to depend on some omission on their part. As was stated in Connelly v. Balkwill, 174 F.Supp. at page 59:

"* * * Rule X 10b–5 imposes the duty to speak and to make a full disclosure of material facts in those circumstances where silence would constitute fraud. Manifestly no such duty arises where the aggrieved buyer or seller of securities relies implicitly upon his own knowledge and business judgment or upon the advice of a third party rather than upon the knowledge and advice of the other party to the transaction. Certainly the more reasonable view would seem to be that the duty to speak which is implicit in Rule X

10b–5 arises in those circumstances where a fiduciary or quasi fiduciary relation exists, where confidence is reposed or influence acquired, where there is a justifiable expectancy of disclosure or reliance upon the superior knowledge of another and in other like circumstances."

List has not proved his reliance on any omission of a defendant. He asserts that he sold because of his reliance on the letter of October 31, 1960 from Rosenberg, Jr., to Seligson in which Rosenberg, Jr. refused to sell the business. No connection between Seligson and defendants is even claimed by plaintiff. Even this reliance is doubtful since List offered the same stock for sale in June, 1960. More importantly, the proof establishes as fact the refusal to sell at that time.

It should be observed that Robinson told Seligson in May, 1960 that List had 5100 shares to sell at $20 per share. Although he first denied seeking a buyer, Seligson was constrained to admit his efforts to sell plaintiff's stock to several parties as early as June 1.

It is more likely that plaintiff, motivated by the potential five point profit he would make, relied on his many dealings in the securities field. These have been constant over a substantial period and have led him to the acquisition of a financial empire. He is a well-known financier whose successful investment activities in the securities market for 30 years has depended to considerable extent on caution and prudence. For many years he has been president of a large corporation listed on the New York Stock Exchange, an experienced member of the financial community. It is hardly possible to imagine a person with greater business sophistication than Albert List.

In contrast with List's active solicitation of this sale, is Lerner's passive action. Lerner purchased the stock from Hentz only after being called on November 16, 1960. Previously he refused the offered shares. Even after the purchase, Lerner disposed of 3137 of 4300 shares within two weeks at a profit of between

17 cents and $1.50 per share. If Lerner had knowledge of a material fact which assured him of a substantial profit, it is not likely that he would have resold almost 75% of the shares he purchased for an average $1 per share brokerage profit.

No evidence has been produced by plaintiff at the trial to show as charged a conspiracy or plan among defendants to purchase his stock through fraudulent misrepresentation. Defendants Lerner and Beaver Associates (a limited partnership composed of defendant Green and his brother) were customers of Hentz. Beaver entered the "sheets" with a bid of $17 a share for Fashion Park on November 7, 1960, three days after the resolution was passed by the board of Fashion Park.

List contends that these facts add up to a conspiracy or fraudulent dealing on the part of defendants. Yet the record shows no more than a coincidence in Beaver's bid for Fashion Park stock. Plaintiff has failed to show knowledge of the November 4, 1960 resolution on the part of Hentz, Green or Beaver or knowledge of any fact which would have caused them to unite to acquire plaintiff's shares from him. Plaintiff has not met the burden of proof necessary to establish a conspiracy.

Accordingly, plaintiff has failed to establish by a fair preponderence of the credible evidence either that defendants contravened the Securities Exchange Act of 1934 or Rule X–10b–5, or that defendants conspired in any way to defraud him.

In sum, the total evidence adduced upon the trial fails to meet either quantitatively or qualitatively the imperative burden of proof which rests upon plaintiff as to the material allegations set out in this complaint.

The complaint is dismissed against the defendants with costs.

This opinion constitutes findings of fact and conclusions of law as required by F.R.Civ.P. 52.

So ordered.