**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**TEXAS GULF SULPHUR COMPANY, a Texas corporation, et al., Defendants.**

**No. 65 Civ. 1182.**

United States District Court
S. D. New York.
Aug. 19, 1966.

fendants with violations of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. 240; 10b–5) promulgated thereunder by the Commission. All parties waived a jury and agreed that trial should first be had on the issue of whether the defendants or any of them had violated Section 10(b) and Rule 10b–5, reserving for later hearing the issue of the remedy to be applied in the event such violations are found.

Llewellyn P. Young, Regional Administrator, Securities and Exchange Commission, by Frank E. Kennamer, Jr., San Francisco, Cal., Michael Joseph, David Ferber, Donald M. Feuerstein, Washington, D. C., for plaintiff.

White & Case, New York City, Orison S. Marden, William D. Conwell, Edward C. Schmults, P. B. Konrad Knake, Thomas McGanney, Peter G. Eikenberry, New York City, of counsel, for defendant Texas Gulf Sulphur Co. and individual defendants, with exception of Lamont, Coates and O'Neill.

Davis Polk Wardwell Sunderland & Kiendl, New York City, S. Hazard Gillespie, Robert B. Fiske, Jr., Robert F. Dobbin, New York City, of counsel, for defendant Thomas S. Lamont.

Cravath, Swaine & Moore, New York City, Albert R. Connelly, Donald I. Strauber, New York City, of counsel, for defendant Francis G. Coates.

## OPINION

BONSAL, District Judge.

Plaintiff, Securities and Exchange Commission (Commission), has instituted this action charging each of the de-

The Commission's action arises out of the exploratory activities of defendant Texas Gulf Sulphur Company (TGS) on the Kidd 55 segment near Timmins, Ontario, between November 12, 1963 and April 16, 1964. TGS is alleged to have violated Section 10(b) and Rule 10b–5 by issuing a false press release regarding these activities on April 12, 1964. Each of the individual defendants was a director, officer or employee of TGS. Individual defendants who purchased stock or calls on stock of TGS between November 12, 1963 and April 16, 1964, or recommended such purchases to others, are charged with violations of Section 10(b) and Rule 10b–5 on the ground that they used to their own advantage material information as to TGS's exploratory activities on the Kidd 55 segment, which material information had not been disclosed to or absorbed by the stockholders or the public. Five of the individual defendants who accepted stock options granted on February 20, 1964 are charged with violations of Section 10(b) and Rule 10b–5 on the ground that they were in possession of such material information which they used to their own advantage by failing to disclose it to the Directors' Committee which granted the stock options.[1]

---

1. At least 49 private actions are now pending in this court against TGS, defendants named in the Commission's action, and others, arising out of the transactions which are the subject matter of the Commission's action. Some 16 of these are individual actions, 31 are said to be class actions, and one is a derivative action. At least 475 persons are included as plaintiffs. While many of the complaints do not specify the damages claimed, others, in the aggregate, claim compensatory damages in excess of $2,-800,000 and punitive damages in excess of $77,000,000.

Texas Gulf Sulphur Company (TGS)

In 1963–64 TGS (which was organized in 1909) was the world's largest supplier of sulphur. Its authorized capital stock was 15,000,000 shares, without par value. 11,520,000 shares had been issued (including 1,504,101 shares held in the Company's treasury). On December 31, 1963, there were issued and outstanding in the hands of the public in excess of 10,000,000 shares held by some 65,000 shareholders. The stock of TGS was listed on the New York Stock Exchange and was admitted to unlisted trading privileges on the Midwest Stock Exchange. TGS's total assets, less current liabilities, had a book value of over $169,000,000 as of December 31, 1963, and over $210,000,000 as of December 31, 1964. The stockholders' equity was stated to be in excess of $129,000,000 as of December 31, 1963, and in excess of $137,000,000 as of December 31, 1964. Its annual sales were in excess of $62,000,000 for 1963 and in excess of $70,000,000 for 1964. Its working capital was approximately $47,000,000 as of December 31, 1963, and approximately $87,000,000 as of December 31, 1964. Its earnings per share for the period 1960–1964 were:

| 1960 | 1961 | 1962 | 1963 | 1964 |
| --- | --- | --- | --- | --- |
| $1.27 | $1.26 | $1.21 | $0.93 | $1.15 |

From 1955 to 1963 TGS's annual sales declined from $93,000,000 in 1955 to $62,000,000 in 1963 and its annual earnings from $32,000,000 in 1955 to $9,300,000 in 1963. This decline was attributed by TGS to the oversupply of sulphur, resulting in depressed prices during the period.

The market price of TGS stock on the New York Stock Exchange declined from a high of $45 a share in 1955 to a low of $11 a share in 1962. In 1963 the price rose from 13¾ in March to 19⅜ in November and to 21⅞ at the end of the year. In 1964 the price rose from a low of 21⅛ in January to a high of 30¼ on April 15. On April 16, the day of TGS's public announcement of the Kidd mine, the price rose from a low of 30⅛ to a high of 37, closing at 36⅜. The price continued to rise during the balance of April 1964 to a high of 58⅜ on April 30, on which day the stock closed at 54¾.

Between 1956 and 1963, despite a growth in the demand for sulphur, the price per ton of sulphur declined from around $28 in 1956 to under $20 in 1963. However, by late 1963 the turn-around had been reached. Sulphur became in short supply, and on April 1, 1964 TGS announced a $2 per ton increase in the price. TGS's gross sales for 1963 were the highest in four years, up 5.56% from 1962.

TGS's 1963 earnings were adversely affected by the mysterious loss of the S.S. MARINE SULPHUR QUEEN early in that year. In January 1964 TGS put into service a larger liquid sulphur cargo vessel to replace the lost vessel and announced the launching of the world's largest liquid sulphur tanker, which would make it possible to ship liquid sulphur to Europe, and on February 8, 1964 it announced plans to increase its Canadian production of sulphur by 500 tons per day.

Apart from its primary sulphur business, TGS was engaged in a diversification program in other fields, such as phosphate, potash, trona, oil and gas. Its entry into the phosphate and potash fields was important because phosphate, potash and sulphur are the three basic components of fertilizers. On November 15, 1963, TGS announced the creation of a new division for its phosphate project and that its potash mine was near completion and was scheduled to go into production in the spring of 1964. On December 16, 1963, TGS announced that it had acquired the Canadian oil and gas properties of Delhi-Taylor Oil Company, and on April 3, 1964 announced plans to proceed with a 3,000,000 ton-per-year phosphate program in North Carolina at a cost of $45,000,000.

TGS had been engaged in exploration for sulphide deposits on the Canadian Shield since 1957 and in 1963–64 under-

took exploratory work on the Kidd 55 segment in Kidd Township near Timmins, Ontario, which is more fully described hereafter.

### The Individual Defendants

The individual defendants are directors, officers and employees of TGS as follows:

| Defendant | Position |
| --- | --- |
| Claude O. Stephens | President and Director |
| Charles F. Fogarty | Executive Vice President* and Director |
| Thomas S. Lamont | Director |
| Francis G. Coates | Director |
| Harold B. Kline | Vice President and General Counsel** |
| Richard D. Mollison | Vice President |
| David M. Crawford | Secretary*** |
| Richard H. Clayton | Engineer |
| Walter Holyk | Chief Geologist |
| Kenneth H. Darke | Geologist |
| Earl L. Huntington | Attorney |
| John A. Murray | Office Manager |

*Prior to February 20, 1964 Mr. Fogarty was Senior Vice President.

**Prior to January 31, 1964 Mr. Kline was Vice President-Administration and Secretary.

***Mr Crawford was employed by TGS in January 1964 and became Secretary on February 20, 1964.

———◆———

Defendant Thomas P. O'Neill was an accountant with TGS. He was served with a summons and complaint, but has failed to answer or appear. The Commission has moved for a default judgment against O'Neill in a separate proceeding. Therefore he is not referred to hereafter.

### Summary of TGS's Exploratory Activities on the Kidd 55 Segment

*Exploration on the Canadian Shield:*

In 1957 TGS initiated an exploration program for sulphides [2] on the Canadian Shield, a vast area comprising most of eastern Canada. Much of the area is barren and flat with few outcroppings of rock and is covered with a swampy material known as muskeg. The subsurface structure consists of Pre-Cambrian rocks, dating from an early geologic time, and is complex and distorted.

Beginning in March, 1959, an exploration group—headed by defendant Mollison, a mining engineer, and consisting of defendant Holyk, the chief geologist; defendant Clayton, an electrical engineer and geophysicist; and defendant Darke, a geologist—conducted aerial geophysical surveys over more than 15,000 miles of the Canadian Shield area. Sulphides conduct electricity better than most other rock types and can be detected if they are in sufficient quantity and concentration and are not too deeply buried beneath the earth's surface.[3]

In the course of this aerial exploration, TGS detected several thousand anomalies—unusual variations in the con-

2. Certain minerals combine with sulphur to form sulphides. Some sulphides, such as chalcopyrite (copper sulphide) and sphalerite (zinc sulphide), may be commercially mined if found in sufficient quantities; others, such as pyrite and pyrrhotite (iron sulphides), have no commercial value.

3. The electromagnetic instruments used in the aerial geophysical surveys indicate only that a conductor of electricity exists. There are many good conductors besides sulphides. For example, graphite and even water are good conductors. On the other hand, zinc sulphides are not conductors.

ductivity of rocks. In the opinion of the exploration group several hundred of these anomalies were worthy of further investigation, and rights to land around them were acquired. One of these anomalies, detected as early as 1959, was located near Timmins, Ontario, and was designated as the Kidd 55 segment. On June 6, 1963, TGS acquired an option to purchase the northeast quarter section (160 acres) of the Kidd 55 segment. Between November 8, 1963 and April 16, 1964 TGS drilled K-55-1, K-55-3, K-55-4, K-55-5, K-55-6, K-55-7 and K-55-10 at the locations shown on the accompanying Plan Map of the Kidd 55 segment.

PLAN MAP
KIDD TOWNSHIP PROPERTY
Scale 1 inch = 20 feet

## Drill Hole K-55-1

On October 29 and 30, 1963, defendant Clayton conducted a ground geophysical survey on the northeast quarter section which confirmed the existence of the anomaly previously detected by the aerial survey. Defendant Clayton interpreted the survey as indicating three separate conductors of electricity tending in a north-south direction with an undetermined width and steep dip. Since the survey only indicated the presence of conductive material and not whether the material consisted of worthless or valuable minerals and since there was little geological evidence as to the makeup of the subsurface structure (the nearest outcroppings of rock were located more than 1,000 feet from the property), diamond core drilling was necessary for further evaluation of the anomaly. TGS had previously drilled 65 equally promising anomalies, but most of them had revealed either barren pyrite or graphite, while a few had shown marginal mineral deposits in insufficient quantities to be commercially mined.

On November 8, 1963, drilling of the initial hole (K-55-1) was begun on section line 2400 S. The location, direction, and angle of the hole were determined by defendants Holyk, Clayton and Darke, who considered the results of the geophysical survey and the location of property boundaries. The collar of the hole was placed about 60 feet to the east of the easternmost conductor, as interpreted by defendant Clayton, and at the strongest part of the anomaly. The hole was drilled westerly at an angle of 60 degrees in the hope that it would cut through all three conductors.

On November 12, 1963, drilling of K-55-1 was terminated at 655 feet. Defendant Holyk visually estimated that the core of K-55-1 indicated an average copper content of 1.15% and an average zinc content of 8.64% over a length of 599 feet. The percentages of copper and zinc mineralization at any given point in the core fluctuated markedly, but the copper mineralization appeared to be concentrated more on the eastern edge of the anomaly.

## Property Acquisition

As a result of the visual examination of the core, TGS determined to acquire the three other quarter sections making up the Kidd 55 segment. Therefore, following the usual practice in the mining industry, security measures were put into effect. Further drilling on the anomaly was suspended and members of the exploration group were instructed to keep the results of K-55-1 confidential. The drill rig at the site of K-55-1 was moved away and cut saplings were stuck in the ground in the area of the hole to conceal its location. A second drill hole (K-55-2) was drilled off the anomaly in order to produce a barren core.

The core from K-55-1 was split longitudinally and shipped to the Union Assay House, Salt Lake City, Utah, for chemical assay. In mid-December, TGS received reports from the assay which revealed an average metal content of approximately 1.18% copper and 8.26% zinc, as well as 3.94 ounces of silver per ton over a 602-foot length of the core. These were the only chemical assay reports on any drill hole which TGS received prior to April 16, 1964.

In the meantime, negotiations for the three other quarter-sections comprising the Kidd 55 segment had been undertaken. TGS purchased one quarter-section outright for $7,500 and acquired options for $7,000 to purchase the other two for approximately $45,000. On March 27, TGS decided that the land acquisition program had advanced sufficiently to permit the company to resume drilling.

## Drill Hole K-55-3

On March 31, the drilling of K-55-3 was commenced on section line 2400 S approximately 75 feet west of the western limits of the anomaly and approximately 510 feet west of K-55-1. It was drilled easterly at an angle of 45 degrees, and therefore crossed K-55-1 in a

vertical plane on section 2400 S. K-55-3 was completed by 7:00 p. m. on April 7 and visual estimates of the core indicated an average copper content of 1.12% and an average zinc content of 7.93% over 641 feet of the hole's 876-foot length. Like K-55-1, K-55-3 indicated substantial copper mineralization on the eastern edge of the anomaly. Daily reports of the progress of K-55-3 and of the subsequent drill holes were made by defendants Mollison and Holyk to defendants Stephens and Fogarty.

### Drill Hole K-55-4

On April 7, drilling of K-55-4 was commenced slightly to the east of the eastern edge of the anomaly on section line 2600 S, 200 feet to the south of K-55-1, and was drilled westerly on an angle of 45 degrees, parallel to K-55-1. By 7:00 p. m. on April 9, K-55-4 had encountered mineralization over 366 feet of its 420-foot length, but had entered a stretch of barren material at the 420-foot mark. The hole was completed to a length of 579 feet on April 10 at 7:00 p. m. without encountering further mineralization. Visual estimates of the 366 feet of mineralized core recovered from K-55-4 indicated an average copper content of 1.14% and an average zinc content of 8.24%. Like K-55-1 and K-55-3, K-55-4 encountered substantial copper mineralization on the eastern edge of the anomaly.

### Drill Holes K-55-6 and K-55-5

On April 8, drilling of K-55-6 was commenced with a second drill rig [4] on section 2400 S, 300 feet to the east of K-55-1. It was drilled westerly at an angle of 60 degrees and was intended to explore mineralization beneath hole K-55-1. Due to the absence of geologists from the drill site on April 8 and 9,[5] no immediate visual estimates of the core were available. It was apparent, however, by the evening of April 10 that the hole had encountered substantial copper mineralization over the last 127 feet of its 569-foot length.

On April 10, drilling of K-55-5 was commenced with a third drill rig on section 2200 S, 200 feet north of K-55-1. The hole was started on the eastern edge of the anomaly and was drilled westerly at an angle of 45 degrees, parallel to the holes previously drilled. By the evening of April 10, K-55-5 had been drilled 97 feet and, although no immediate visual estimates of the core were available, it was apparent that the hole had intersected substantial copper mineralization over the last 42 feet of its length.

The results of drilling through the evening of April 10 were available to TGS when it issued its April 12 press release.

### Core Drilling between 7:00 p. m. April 10 and 7:00 a. m. April 13

Drilling of K-55-5 and K-55-6 continued, and by the morning of April 13, K-55-5 had encountered mineralization to the 580-foot mark. It was subsequently drilled to a length of 757 feet without encountering further mineralization. Visual estimates of the core indicated that over a 525-foot section the drill hole had intersected an average copper mineralization of 0.82% and an average zinc mineralization of 4.2%. By 7:00 a. m. on April 13, K-55-6 had encountered mineralization to the 946-foot mark. It was subsequently drilled to a length of 1180 feet without intersecting any further mineralization. Visual estimates of a 504-foot section of the core

---

4. Prior to April 7 a shortage of water needed for drilling prevented the operation of more than one drill rig. The second rig was put into operation on April 8, and the third and fourth rigs were put into operation on April 10 and 12 respectively.

5. Seven feet of snow on the ground during this period impeded travel between the Kidd 55 segment and Timmins, 15 miles away, the trip taking as long as four hours.

indicated an average copper content of 1.72% and an average zinc content of 6.60%.

On April 12 drilling of K-55-7 was commenced with a fourth drill rig on section 2000 S at the eastern edge of the anomaly. It was drilled westerly at an angle of 45 degrees and by the morning of April 13 had encountered 50 feet of mineralization over the 137 feet drilled. The drilling of a mill test hole, K-55-8, was also commenced by April 11 and completed by the evening of April 13. The core was 2¼ inches in diameter as compared with the 1⅛ inch diameters of the other holes, and was intended to be used for metallurgical testing to determine the amenability to milling of the material that had been encountered. No geologist's log or visual estimates were made of K-55-8 and no metallurgical tests of the core were reported prior to April 16.

*Core Drilling between 7:00 a. m. April 13 and 7:00 p. m. April 15*

On April 14 drilling of K-55-10 was commenced on section 2800 S on the eastern edge of the anomaly and was drilled westerly at an angle of 45 degrees. By 7:00 p. m. on April 15, it had encountered mineralization over the last 231 feet of the 249 feet of drilling. Drilling of

K-55-7 was completed to a length of 707 feet, but encountered only 26 more feet of mineralization between the 425-foot and the 451-foot marks.

### Purchase of TGS Stock and Calls on TGS Stock by Certain Defendants and "Tippees" between November 12, 1963 and April 16, 1964

The evidence established that all of the individual defendants except Stephens and Kline purchased shares of TGS and/or calls on TGS stock between November 12, 1963, when the first drill hole on the Kidd property was completed (K-55-1), and the close of business on April 16, 1964, the day on which TGS issued a press release announcing the discovery of a copper mine on the Kidd 55 segment at a press conference called for the purpose. The evidence also shows that certain persons who were referred to by counsel at the trial as "tippees" purchased shares of TGS and/or calls on TGS stock on the basis of advice received directly or indirectly from defendants Darke, Coates and Lamont. The following table lists these purchases (including those of defendant Holyk's wife), but does not include the shares covered by stock options granted by TGS to certain defendants on February 20, 1964.

| Purchase Date | Purchaser | Shares | | Calls | |
|---|---|---|---|---|---|
| | | Number | Price | Number | Exercise Price |
| **HOLE K-55-1 COMPLETED NOVEMBER 12, 1963** | | | | | |
| 1963 | | | | | |
| Nov 12 | Fogarty | 300 | 17¾–18 | | |
| 15 | Clayton | 200 | 17¾ | | |
| 15 | Fogarty | 700 | 17⅝–17⅞ | | |
| 15 | Mollison | 100 | 17⅞ | | |
| 19 | Fogarty | 500 | 18⅛ | | |
| 26 | Fogarty | 200 | 17¾ | | |
| 29 | Holyk (Mrs.) | 50 | 18 | | |

| Purchase Date | Purchaser | Shares | | Calls | |
|---|---|---|---|---|---|
| | | Number | Price | Number | Exercise Price |
| CHEMICAL ASSAYS OF DRILL CORE OF K-55-1 RECEIVED DECEMBER 9–13, 1963 | | | | | |
| Dec 10 | Holyk (Mrs.) | 100 | 20⅜ | | |
| 12 | Holyk (or wife) | | | 200 | 21 |
| 13 | Mollison | 100 | 21⅛ | | |
| 30 | Caskey* | | | 300 | 22¼ |
| 30 | Fogarty | 200 | 22 | | |
| 31 | Fogarty | 100 | 23¼ | | |
| 1964 | | | | | |
| Jan 6 | Holyk (or wife) | | | 100 | 23⅝ |
| 8 | Murray | | | 400 | 23¼ |
| 16 | Westreich* | 2000 | 21¼–21¾ | | |
| 24 | Holyk (or wife) | | | 200 | 22¼–22⅜ |
| Feb 10 | Fogarty | 300 | 22⅛–22¼ | | |
| 17 | Atkinson* | 50 | 23¼ | 200 | 23⅛ |
| 17 | Westreich* | 50 | 23¼ | 1000 | 23¼–23⅝ |
| 20 | Darke | 300 | 24⅛ | | |
| 24 | Clayton | 400 | 23⅞ | | |
| 24 | Holyk (or wife) | | | 200 | 24⅛ |
| 24 | Miller* | | | 200 | 23¾ |
| 25 | Miller* | | | 300 | 23⅜–23½ |
| 26 | Holyk (or wife) | | | 200 | 23⅜ |
| 26 | Huntington | 50 | 23¼ | | |
| 27 | Darke (Moran as nominee) | | | 1000 | 22⅝–22¾ |
| Mar 2 | Holyk (Mrs.) | 200 | 22⅜ | | |
| 3 | Clayton | 100 | 22¼ | | |
| 3 | E. W. Darke* | | | 500 | 22½–22⅝ |
| 16 | Huntington | | | 100 | 22⅜ |
| 16 | Holyk (or wife) | | | 300 | 23¼ |
| 17 | Holyk (Mrs.) | 100 | 23⅞ | | |
| 17 | E. W. Darke* | | | 200 | 23⅜ |
| 23 | Darke | | | 1000 | 24¾ |
| 26 | Clayton | 200 | 25 | | |
| LAND ACQUISITION COMPLETED MARCH 27, 1964 | | | | | |
| Mar 30 | Atkinson* | | | 400 | 25¾–25⅞ |
| 30 | Caskey* | 100 | 25⅞ | 1000 | 25¾–25⅞ |
| 30 | Darke | | | 1000 | 25½ |
| 30 | E. W. Darke* | | | 200 | 25½ |
| 30 | Holyk (Mrs.) | 100 | 25⅞ | | |
| 30–31 | Klotz* | | | 2000 | 25½–26⅛ |
| 30 | Miller* | | | 500 | 25½–25⅞ |
| 30 | Westreich* | 500 | 25¾ | | |
| CORE DRILLING OF KIDD 55 SEGMENT RESUMED MARCH 31, 1964 | | | | | |
| Apr 1 | Clayton | 60 | 26½ | | |
| 1 | Fogarty | 400 | 26½ | | |
| 2 | Clayton | 100 | 26⅞ | | |
| 6 | Fogarty | 400 | 28⅛–28⅞ | | |
| 8 | Mollison (Mrs.) | 100 | 28⅛ | | |

| Purchase Date | Purchaser | Shares | | Calls | |
|---|---|---|---|---|---|
| | | Number | Price | Number | Exercise Price |

**421 FEET KIDD-55-4 COMPLETED APRIL 9, 1964, 7 P.M.**

**TGS PRESS RELEASE ISSUED APRIL 12, 1964**

| Purchase Date | Purchaser | Shares | | Calls | |
|---|---|---|---|---|---|
| Apr 15 | Clayton | 200 | 29⅜ | | |
| 16 | Crawford (and wife) | 600 | 30⅛–30¼ | | |

**TGS PRESS RELEASE AND PRESS CONFERENCE APRIL 16, 1964, 10 A. M.**

| Purchase Date | Purchaser | Shares | | Calls | |
|---|---|---|---|---|---|
| Apr 16 | Coates (for family trusts) | 2000 | 31–31⅝ | | |
| 16 | Haemisegger** | 300 | 32½ | | |
| 16 | Robt. L. Armstrong** | 200 | 31¼–34½ | | |
| 16 | Charles Callery** | 300 | 32½ | | |
| 16 | James A. Baker III** | 200 | 32⅝ | | |
| 16 | Malcolm G. Baker, Jr.** | 500 | 34½–35 | | |
| 16 | Morgan Guaranty Trust Co.*** | 10,000 | 32⅝–34 | | |
| 16 | Lamont and family**** | 3,000 | 34½ | | |

\* Darke visited Mrs. Caskey and her daughter Miss Atkinson in Washington between Dec. 25 and Dec. 30, 1963 and recommended TGS. They in turn recommended TGS directly or indirectly to others marked with \*, with the exception of E. W. Darke, Darke's brother, who purchased calls on Darke's recommendation.

\*\* Purchased by Haemisegger, Coates' son-in-law, for himself and customers (\*\*) following telephone call from Coates before 10:20 a.m.

\*\*\* Purchased for its customers' accounts following call from Lamont to Hinton at about 10:40 a.m.

\*\*\*\* Purchased through Morgan Guaranty Trust Co. after 12:33 p.m.

——◆——

### The Securities Exchange Act of 1934 (the Act) and Rule 10b–5

The Commission has instituted this action pursuant to Section 27 of the Act (15 U.S.C. § 78aa) which confers upon the District Courts of the United States exclusive jurisdiction of violations of the Act or of the rules and regulations promulgated thereunder and of "all suits in equity and actions at law brought to enforce any liability or duty created by" the Act or the rules and regulations thereunder.

The preamble of the Act states that it is "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes."

Section 2 (15 U.S.C. § 78b) provides that:

"\* \* \* transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, \* \* \* and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce \* \* \* and to insure the mainte-

nance of fair and honest markets in such transactions * * *."

Section 2(2) (15 U.S.C. § 78b(2)) provides:

"The prices established and offered in such transactions are generally disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold * * *."

Section 2(3) (15 U.S.C. § 78b(3)) states that:

"Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control * * *."

Section 4(a) (15 U.S.C. § 78d(a)) provides for the establishment of the Commission as the agency charged with the administration of the Act.

Section 10 of the Act (15 U.S.C. § 78j) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Pursuant to the authority conferred on the Commission by Section 10(b), in May, 1942 the Commission promulgated

Rule 10b–5 (17 C.F.R. 240; 10b–5), which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

In Rule 10b–5 the Commission adapted the language of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q) relating to fraudulent interstate transactions. Similar language was also used in Section 206 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–6).[6]

The Commission has the responsibility of administering the Act and of securing compliance therewith. To carry out this responsibility, it has been given, among other powers, authority under Sections 21(e) and 27 (15 U.S.C. §§ 78u, 78aa) to institute actions in the district courts to enjoin existing or prospective violations of the Act and to enforce any liability or duty created by the Act or the rules and regulations promulgated pursuant thereto. The Commission contends that the defendants engaged in a "course of business" which operated "as a fraud or deceit" on the stockholders of TGS in violation of Section 10(b) and Rule 10b–5.[7]

---

**6.** Rule 10b–5 is general in terms. Other rules under Section 10(b) are more specific. See Rule 10b–6, which applies Section 10(b) to underwriters, issuers, brokers, dealers, etc. Compare also Rule 10b–2 with reference to solicitation of purchases on an exchange to facilitate a distribution of securities.

**7.** In its briefs and at trial the Commission made no distinction between the three sections of Rule 10b–5, relying on List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), where the court noted that as long as a violation of the Rule is alleged, it makes little difference which section of the Rule is invoked.

The defendants assert that the Commission must establish the elements of common law fraud—misrepresentation or nondisclosure, materiality, scienter, intent to deceive, reliance, and causation —citing decisions in private actions brought under Section 10(b) requiring proof of one or more of these traditional elements as a condition precedent to relief. Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786 (2d Cir. 1951) ("proof of fraud is required in suits under § 10 (b) of the 1934 Act * * *."); Weber v. C. M. P. Corporation, 242 F.Supp. 321, 324 (S.D.N.Y.1965) (scienter); Barnett v. Anaconda Company, 238 F.Supp. 766, 771 (S.D.N.Y.1965) (causation). See, Comment, "Civil Liability Under Section 10(b) and Rule 10b–5: A Suggestion for Replacing the Doctrine of Privity," 74 Yale L.J. 658 (1965).

However, recent decisions, even in private suits, do not require proof of these elements in actions charging violations of Rule 10b–5. Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961). In Stevens v. Vowell, 343 F.2d 374, 379 (10th Cir. 1965), the court stated:

> "It is not necessary to allege or prove common law fraud to make out a case under the statute and rule. It is only necessary to prove one of the prohibited actions such as the material misstatement of fact or the omission to state a material fact."

In a regulatory or enforcement proceeding under Section 27 of the Act, the Commission is not required to prove these common law elements. In S. E. C. v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the defendant was an investment adviser who published a monthly report, mailed to approximately 5,000 customers, which recommended certain securities for long term investment. Before mailing the report, the defendant would purchase the recommended securities on the market and when the price rose after customers received the report, defendant would sell at a profit. The Commission sought an injunction under Section 206 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–6) [8] to compel defendant to disclose this practice to customers. The district court denied a preliminary injunction on the ground that "fraud" was used in the Investment Advisers Act of 1940 in its technical common law sense and that the Commission had failed to establish an intent to injure clients or an actual loss to clients. (191 F.Supp. 897, 898.) The Second Circuit Court of Appeals, sitting *en banc,* affirmed the district court by a 5-to-4 vote. (306 F.2d 606.)

In reversing, the Supreme Court held that:

> "It would defeat the manifest purpose of the Investment Advisers Act of 1940 for us to hold, therefore, that Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit,' intended to require proof of intent to injure and actual injury to clients. (375 U.S., at 192, 84 S.Ct., at 283).

\*　\*　\*　\*　\*　\*

> "Congress intended the Investment Advisers Act of 1940 to be *construed like other securities legislation* 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes. (375 U.S., at 195, 84 S.Ct., at 284.) (Emphasis supplied)

---

There was no evidence, however, that the defendants employed "any device, scheme, or artifice to defraud" under section (1) or made any representations under section (2). Therefore, only section (3) is applicable to the facts of this case.

8. Section 206 provides in part that:
"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud any client or prospective client;
(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; * * *."

Since there is a direct parallel between the language of Rule 10b–5(3) and Section 206 of the Investment Advisers Act of 1940, both in wording and in intent, the use of "fraud" in Rule 10b–5(3) cannot be interpreted in its narrow common law sense. Cf., Berko v. Securities and Exchange Commission, 316 F.2d 137 (2d Cir. 1963).

■ The suggestion made by the defendants that Section 16 of the Act (15 U.S.C. § 78p), relating to directors, officers, and principal stockholders, defines "insiders" and limits the liabilities of insiders to the sanctions provided in Section 16, is equally without merit. A Section 16 action can be brought only by the corporation itself or derivatively by an existing security holder against officers, directors or beneficial owners of ten per cent or more of the corporation's listed equity securities. It covers only short-swing profits realized within a six-month period, and any recovery inures to the corporation. Profits are recoverable regardless of any intent to defraud and without proof that they were realized by reason of inside information. In short, Section 16 was enacted as a "crude rule of thumb" to make unprofitable all short-swing speculation by a specifically defined group of insiders. See, Blau v. Lamb, 363 F.2d 507 (2d Cir., 1966).

A Section 10(b) action, on the other hand, may be brought pursuant to Section 27 by the Commission or by any party claiming to have been defrauded. The section applies to "any person," not merely to the persons encompassed by Section 16. H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y.1960) (accountants); Cady, Roberts & Co., 40 S.E.C. 907 (1961) (broker). Section 16 requires both a purchase and a sale of a listed security, while Section 10(b) applies to a purchase or sale of any security. The numerous differences between Section 16 and Section 10(b) clearly indicate that the provisions of the former impose no limitation on the enforcement of the latter. See, 3 Loss, Securities Regulation, 1473, 1474 (2d ed. 1961); Comment, "The Prospects for Rule X–10B–5: An Emerging Remedy for Defrauded Investors," 59 Yale L.J. 1120, 1140–42 (1950).

To establish violations of Section 10(b) and Rule 10b–5(3), the Commission must prove that the defendants engaged in a "course of business" which operated as a "fraud or deceit * * * in connection with the purchase or sale of any security." Questions arise therefore as to whether insider purchases based on material, undisclosed information constitute violations of Section 10(b) and Rule 10b–5(3); if so, who are insiders; whether the statute and rule are limited to "face-to-face" transactions; and, finally, what constitutes material information.

■■ The statute and rule go at least as far as the federal common law rule. List v. Fashion Park, Inc., 340 F.2d 457, 461–462 (2d Cir. 1965). As long ago as 1909, the Supreme Court held in Strong v. Rapide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), that the failure of the director and general manager of a corporation to disclose "special facts" in purchasing its securities operated as a fraud on the seller. The Court stated that:

"If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists." 213 U.S., at 431, 29 S.Ct. at 525.

Applying this "special facts" doctrine to Section 10(b) and Rule 10b–5, trading by an insider on the basis of material undisclosed information constitutes a deceptive practice in violation of the statute and rule. See, Loss, supra, at 1445–73.

■ In Strong v. Rapide, the defendant was a director and general manager of the corporation, and owned three-fourths of its outstanding shares. He

was, therefore, an insider under any standard. Section 10(b) has been construed as imposing a similar liability on officers, directors, and major stockholders. Cochran v. Channing Corporation, 211 F.Supp. 239 (S.D.N.Y.1962). Further, since Section 10(b) applies to "any person" it can include "insiders" who are not officers, directors or major stockholders. *Cady, Roberts & Co.,* supra, at 912.

In Brophy v. Cities Service Co., 31 Del. Ch. 241, 70 A.2d 5, 7 (1949), the court pointed out "if an employee in the course of his employment acquires secret information relating to his employer's business, he occupies a position of trust and confidence toward it, analogous in most respects to that of a fiduciary, and must govern his actions accordingly."

█ Citing Brophy, the Commission in *Cady, Roberts & Co.,* supra, found that the obligation to disclose material information rests on two grounds:

" * * * first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing that it is unavailable to those with whom he is dealing." 40 S.E.C., at 912.

Therefore, insiders subject to the disclosure requirements of Section 10(b) and Rule 10b–5 may include employees as well as officers, directors, and controlling stockholders who are in possession of material undisclosed information obtained in the course of their employment.

█ An insider's liability for failure to disclose material information which he uses to his own advantage in the purchase of securities extends to purchases made on national securities exchanges as well as to purchases in "face-to-face" transactions. List v. Fashion Park, Inc., supra, 340 F.2d at 461–462. In Cochran

v. Channing Corporation, supra, 211 F. Supp. at 243, the court stated:

"The Securities Exchange Act was enacted in part to afford protection to the ordinary purchaser or seller of securities. Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak. It is the use of inside information that gives rise to a violation of Rule 10b–5. [Citations omitted.] Lack of communication between defendant and plaintiff does not eliminate the possibility that Rule 10b–5 has been violated."

And, as noted in *Cady, Roberts,* "it would be anomalous indeed if the protection afforded by the anti-fraud provisions were withdrawn from transactions effected on exchanges, primary markets for securities transactions." 40 S.E.C., at 914.

█ In response to the defendants' contention that it would be impossible for an insider trading on a national exchange to seek out the other party to the transaction and disclose material information to him (Goodwin v. Agassiz, 283 Mass. 358, 186 N.E. 659 (1933)), it is clear that there are other ways of disclosing significant corporate developments. The New York Stock Exchange provides in its *Company Manual* that "important developments which might affect security values or influence investment decisions should be promptly disclosed." (Listing Agreement at A–20.) If legitimate business reasons require a period of nondisclosure, the insider should forego transactions in his company's securities during that period. *Cady, Roberts,* supra, at 911. As stated by the court in Oliver v. Oliver, 118 Ga. 362, 45 S.E. 232, 234 (1903):

"It might be that the director was in possession of information which his duty to the company required him to keep secret; and, if so, he must not disclose the fact even to the share-

holder, for his obligation to the company overrides that to an individual holder of the stock. But if the fact so known to the director cannot be published, it does not follow that he may use it to his own advantage, and to the disadvantage of one whom he also represents. The very fact that he cannot disclose prevents him from dealing with one who does not know, and to whom material information cannot be made known."

However, to establish a violation of Section 10(b) and Rule 10b–5, the undisclosed information must be material. List v. Fashion Park, Inc., supra. There is nothing in the Act which precludes insiders from purchasing stock of their company or from being beneficiaries of the company's incentive stock option plan. On the contrary, it is important under our free enterprise system that insiders, including directors, officers, and employees, be encouraged to own securities of their company. The incentive that comes with stock ownership benefits both the company and its stockholders.

Moreover, it is obvious that any director, officer, or employee will know more about his company or have more specialized knowledge as to at least some phase of its business than an outside stockholder can have or expect to have. Often this specialized knowledge may whet the speculative interest of the insider, particularly if he believes in the future of his company, and may lead him to purchase stock. Purchases under such circumstances are not encompassed by Section 10(b) and Rule 10b–5. As stated in Loss, supra, at 1463:

"* * * an insider is under no obligation to give the ordinary investor the benefit of his superior financial analysis. It has been aptly said that, 'Even though a shrewd guess by an insider is often worth fifty accounting statements, it would be highly unfair to make him publicize his guess and then to hold him responsible if it turns out to be wrong.'" (Quoting, Comment,

"The Prospects for Rule X–10B–5," 59 Yale L.J., at 1148.)

However, where an insider comes into possession of *material* information which he uses to his own advantage by purchasing stock or calls on the stock of his company prior to public disclosure, he violates Section 10(b) and Rule 10b–5. Information is not material merely because it would be of interest to the speculator on Bay Street or Wall Street. Material information has been defined as information "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * *." List v. Fashion Park, Inc., supra, 340 F.2d at 462, citing, Kohler v. Kohler Co., 319 F. 2d 634, 642 (7th Cir. 1963). It is information which, if known, would clearly affect "investment judgment," *Cady, Roberts,* supra, at 911, or which directly bears on the intrinsic value of a company's stock. See, Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa. 1947); Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del.1951); Ward La-France Truck Corp., 13 S.E.C. 373 (1943).

Material information need not be limited to information which is translatable into earnings, as suggested by defendants. But the test of materiality must necessarily be a conservative one, particularly since many actions under Section 10(b) are brought on the basis of hindsight. As stated by a former member of the staff of the Commission:

"It is appropriate that mangement's duty of disclosure under rule 10b–5 be limited to those situations which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if disclosed. A more rigorous standard would impose an unreasonable burden on management in its securities trading. Moreover, such a standard could involve the courts to an unrealistic degree in the determination of whether certain types of information might have an impact on the market. A finer web might well

prevent some management trading that represents an abuse, but only at the cost of possibly exposing management to meritless litigation in many other cases." (Fleischer, "Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding," 51 Va.L. Rev. 1271, 1289 (1965).)

### Application of Section 10(b) of the Act and Rule 10b–5 to Purchases by Individual Defendants

 All of the individual defendants were directors, officers or employees of TGS. With the exceptions of Stephens and Kline, each purchased stock of TGS using the facilities of a national securities exchange. Accordingly, the jurisdictional requirements of the Act and Rule 10b–5 have been satisfied with respect to those purchases. The issue remains as to whether any of the defendants in purchasing TGS stock or calls on TGS stock were using for their own advantage material information as to the drilling on the Kidd 55 segment not disclosed to the public. Defendants Huntington and Murray had no detailed knowledge as to the work and hence were not in possession of material information. Huntington knew only that TGS was acquiring property rights in Kidd Township. Murray had no knowledge of the situation on the Kidd 55 segment at the time he made his purchases. In considering whether the remaining individual defendants were in possession of material information when they made their pur-

chases, the period from November 12, 1963 to April 16, 1964 may be conveniently subdivided as follows:

(1) November 12, 1963 to 7:00 p. m. April 9, 1964

(2) 7:00 p. m. April 9 to 10:00 a. m. April 16, 1964

(3) April 16, 1964 from 10:00 a. m. to the close of business on that day.

(1) *November 12, 1963 to 7:00 p. m. April 9, 1964*

 K–55–1 was completed on November 12, 1963. Visual estimates at the drill site, which were subsequently confirmed by chemical assays received in mid-December, indicated substantial zinc and copper mineralization over approximately 600 feet of the core's 657 foot length. On the basis of the visual estimates, TGS took customary security measures to maintain the secrecy of the drilling results while it undertook to acquire the remaining quarter sections of the Kidd 55 segment. On March 31, 1964 drilling was resumed.

K–55–3 was drilled and established that mineralization existed in a vertical plane over 350 feet wide and 500 feet deep. On April 7 drilling of K–55–4 was begun 200 feet south of K–55–1 and by 7:00 p. m. on April 9 it had been drilled to 421 feet and had encountered 366 feet of mineralization. K–55–1, K–55–3, and K–55–4 intersected substantial copper mineralization on the eastern edge of the anomaly.

According to the Commission's experts, Adelstein [9] (the Commission's chief min-

---

9. At the trial, the Commission called as expert witnesses Benjamin Adelstein and Edwin M. Pennebaker. Mr. Adelstein has been the Chief Mining Engineer for the Commission since 1941. He was previously employed by Anaconda Copper Company and by the United States Coast and Geodetic Survey and the United States Corps of Engineers. Mr. Pennebaker is a mining geologist from Scottsdale, Arizona with many years of experience, who was appointed Consulting Geologist to the Commission in November 1965.

TGS called as expert witnesses: James D. Forrester, geologist, Dean of the University of Arizona School of Mines and Director of the Arizona Bureau of Mines, Tucson, Arizona; Charles F. Park, Jr., geologist, Professor of Geology at Stanford Universtiy, where he was Dean of the School of Earth Sciences from 1950–1965; Cloyd M. Wiles, mining engineer with National Lead Company from 1942 until his retirement in 1963; Graham Walkey, mining engineer and geologist with Kamkotia Mines, which is located approximately 12 miles from the Kidd 55 segment; Willard C. Lacy, geologist, professor at the University of Arizona and head of the University's Department of Mining and Engineering;

ing engineer) and Pennebaker (consulting geologist to the Commission), K–55–4 established a third dimension to the mineralized zone, so that the drilling through 7:00 p. m. on April 9 established a mine.[10]

The geologists called by the defendants disputed the conclusions reached by Adelstein and Pennebaker, unanimously agreeing that the drilling of the three holes to 7:00 p. m. on April 9 did not establish that TGS had a mine. The Commission has taken the position with respect to registration statements filed under the Securities Act of 1933 that "three diamond drill holes are insufficient to determine whether a commercial ore body is present, even though they should encounter a gold bearing structure." Pan-American Gold Ltd., 31 S.E. C. 141, 147–8 (1950).

It is unnecessary to determine whether TGS had a mine since the drilling of K–55–4 to 7:00 p. m. on April 9 was a strong indication that the mineralization encountered on the vertical plane between K–55–1 and K–55–3 extended southward 200 feet. There was real evidence that a body of commercially mineable ore might exist. At 7:00 p. m. on April 9, those with knowledge of the drilling results had material information which it was reasonably certain, if disclosed, would have had a substantial impact on the market price of TGS stock. Therefore, they were under a duty not to use such material information to their personal advantage without first disclosing it to the public.

However, the drilling results up to 7:00 p. m. on April 9 did not provide such material information. When considered in relation to the far-flung business of TGS at the time, it cannot be said that the drilling results of K–55–1 and K–55–3 constituted material information, the disclosure of which would have had a substantial impact on the market price of TGS's 10,000,000 outstanding shares.

### K–55–1

There is no doubt that the drill core of K–55–1 was unusually good and that it excited the interest and speculation of those who knew about it. However, all the experts agreed that one drill core does not establish an ore body, much less a mine. Defendants' experts unanimously concluded that there is no way even to estimate the probabilities that one drill core will lead to the discovery of an ore body. Concededly, the geophysical survey conducted prior to the drilling of K–55–1 indicated a "first class" anomaly over a length of more than 1,000 feet, but the conductive materials evidenced by the survey outside the first drill hole could have consisted of worthless pyrite or graphite, both of which materials were found in the core of K–55–1. As stated by Boniwell, a mining geophysicist, geophysics is of little help in predicting continuity.

Donald McLaughlin, geologist, Chairman of the Board and formerly president of Homestake Mining Company; John B. Boniwell, geophysicist with eight years' experience on the Canadian Shield; Douglas H. Bellemore, security analyst, Professor of Finance at the Graduate School of Business Administration at New York University; and Alvin W. Pearson, security analyst, president of Lehman Corporation and chairman of its Portfolio Committee.

10. Adelstein testified that on the basis of work done to 7:00 p. m. on April 9 TGS could have calculated ore reserves of 7.7 million tons with a gross assay value of $204,200,000. Pennebaker testified that TGS could have calculated ore reserves of 5.5 million tons with a gross assay value of $197,200,000. Adelstein

defined gross assay value to mean "the sum of the products of the number of units of each metal of commercial value times the prevailing price for each metal. * * *" Since gross assay value does not take account of the costs of mining, milling, smelting, sales, overhead, cost of capital, etc., it can be misleading and its use in registration statements is prohibited by the Commission. For example, Wiles estimated that 95.2% of the gross assay value of the ore deposit on the Kidd 55 segment would be expended for the above purposes. Although his figures appear to be conservative and though ore with a much lower gross assay value than that on the Kidd 55 segment is commercially mined, his testimony illustrates why gross assay value is not a good indicator.

Moreover, the core of K–55–1 was not solid ore. The percentages of copper and zinc mineralization fluctuated markedly. Although it appears this is not unusual due to the complex nature of the Pre-Cambrian subsurface rock structure, it supports the testimony of defendants' experts that no predictions could be made as to how far mineral values encountered by K–55–1 extended beyond the 1⅛ inch drill core. As was brought out by Walkey, a mining engineer employed by Kamkotia Mines 12 miles from the Kidd 55 segment, mineral deposits on the Canadian Shield tend to be highly irregular in structure, with wide variations in grade. Walkey, Boniwell and Wiles (a mining engineer with forty years' experience) testified as to instances where one drill hole had produced a promising core but subsequent drilling had shown that the mineral values did not extend any appreciable distance beyond that core. Therefore, the first promising core may turn out to be a liability by inducing further drilling with negative results.[11]

Bellemore and Pearson, security analysts called by defendants, testified that from an investment point of view no significance could be attached to the results of a single drill hole, however rich.

The most that can be said of the individual defendants' knowledge after the drilling of K–55–1 is that they had "hopes, perhaps with some reason," that it would lead to a mine. James Blackstone Mem. Lib. Ass'n v. Gulf, M. & O. R. Co., 264 F.2d 445, 450 (7th Cir. 1959). The results of K–55–1 were too "remote" when considered in light of the size of TGS, the scope of its activities, and the number of its outstanding shares, to have had any significant impact on the market, i. e., to be deemed material. List v. Fashion Park, Inc., supra.

The Commission contends, however, that the results of K–55–1 were material because of the significance attached to those results by certain defendants. Between the completion of K–55–1 on November 12, 1963 and the completion of K–55–3 on April 7, 1964, defendants Fogarty, Mollison, Holyk, Clayton and Darke spent more than $100,000 in purchasing stock and calls on the stock of TGS. These defendants could bring considerable expertise to bear in evaluating the results of K–55–1 and their purchases may have been prompted by an educated guess that K–55–1 would lead to the discovery of a mine. Therefore, a question is presented as to whether information which may have special significance to an insider because of his professional background, is material.

A similar question would be presented where an engineer in the research department of a publicly-held corporation believes that he may have invented a process which will substantially increase the corporation's earnings or where a chemist in a large pharmaceutical firm thinks that he may have devised a chemical formula which can cure cancer. In these instances it can be assumed that the insider, because of his educated guess, will be enthusiastic and his enthusiasm may lead him to purchase stock in his company and to recommend the stock to his associates and friends even though his educated guess may turn out to be wrong.

11. Members of the TGS exploration group could not state with certainty that K–55–1 had not been drilled down dip. In a memorandum written on November 14, 1963, defendant Holyk stated that: "While there are some indications that the drill hole is drilling across the dip, there are also numerous instances of bedding and minerals stratification to be almost parellel to the core axis. Accordingly, it is impossible to estimate the true width of the sulphide zone until a second drill hole is directed across this intersection from west to east. It may well be that the zone is quite narrow in the event that the drill hole has been directed down dip." The Commission offered testimony as to banding, mineral stratification within the drill core, to establish that K–55–1 had been drilled across the mineral zone and not down dip. The significance of banding, particularly without more drilling, was strongly disputed by defendants' experts.

It may be argued that such purchases are "unfair" to the outside stockholders and come within the ambit of Section 10(b) and Rule 10b–5. Purchases on the basis of educated guesses may be viewed as an attempt to secure additional corporate compensation. Cary, "Corporate Standards and Legal Rules," 50 Calif.L.Rev. 408 (1962).

However, most insiders necessarily have educated guesses about the prospects of particular company programs. If it is held that purchases made on the basis of educated guesses are proscribed by Section 10(b) and Rule 10b–5, insiders who purchase stock in their company will do so at their peril. If they announce their educated guesses before purchasing and their guesses turn out to be wrong, they would be subject to suit; and if they purchase and keep their educated guesses to themselves and they turn out to be right, they would again be subject to suit. The creation of such a dilemma would result in insiders not buying at all although insiders should be encouraged to have a stake in the companies for which they work.

The outside stockholder can never match the knowledge of an insider who necessarily knows more about the company and is in a better position to evaluate its prospects. It may be that the "fairness" overtones of *Cady, Roberts* indicate a trend toward the elimination of all insider purchasing. But even were the Court prepared to accept the proposition that all insider trading is unfair, a proposition of doubtful validity at best, it would be deterred by the admonition of Judge Learned Hand that it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant * * *." Spector Motor Service, Inc. v. Walsh, 139 F.2d 809, 823 (2d Cir. 1944) (dissenting opinion) (reprinted in Bar Bulletin, N. Y. Co. Lawyers Assn, Vol. 23, No. 4, at 156, 1965–66). Therefore the purchases prior to 7:00 p. m. on April 9 were not based on material undisclosed information even if the purchasers had educated guesses based on the results of the first drill hole.

*K–55–3*

K–55–3 established that K–55–1 had not gone down dip, and indicated a vertical plane on section 2400 S containing mineralization. However there was no indication that the mineralization extended beyond the plane. Defendant Mollison testified that at Kamkotia a drill hole could produce substantial mineralization while another 50 feet away produced a barren core. The results of K–55–3 added to the information previously known but did not constitute material information. If disclosed, it would not have had a substantial impact on the market price of the Company's stock.

Accordingly, the purchases made by certain defendants prior to 7:00 p. m. on April 9, 1964 were not based on material information. The fact that subsequent drilling established a major ore body is immaterial. As stated recently in Value Line Fund, Inc. v. Marcus, CCH Fed. Sec.L.Rep., ¶ 91,523, at 94, 956 (S.D. N.Y.1965), "the court must be guided not by hindsight, but by the facts as they existed at the time of the * * challenged transaction."

Similarly, purchases by Darke's "tippees" prior to 7:00 p. m. on April 9 were not made on the basis of material undisclosed information. Toward the end of December, 1963, Darke visited Caskey and Atkinson in Washington. The evidence shows no more than that Darke indicated to them that he thought TGS was a good buy. There is no direct evidence that Darke again communicated with any of his "tippees," but the record shows that on March 30, 1964 Darke and his "tippees," Atkinson, Caskey, E. W. Darke, Klotz, Miller and Westreich, purchased substantial amounts of TGS stock and calls on TGS stock. As the Commission points out, this is strong circumstantial evidence that Darke must have passed the word to one or more of his "tippees" that drilling on the Kidd 55 segment was about to be resumed. But, for the reasons hereinbefore stated, this information was not material.

For the foregoing reasons, the Court finds no violations of Section 10(b) or Rule 10b–5 on the part of any of the individual defendants who purchased shares of TGS or calls on TGS stock or recommended such purchases to others prior to 7:00 p. m. on April 9, 1964.

(2) *7:00 p. m. April 9, 1964 to 10:00 a. m. April 16, 1964*

Defendant Clayton purchased 200 shares of TGS stock on April 15; defendant Crawford purchased 600 shares on April 16. These defendants (and defendants Coates and Lamont) raise the defense that even if they were in possession of material information when they made their purchases, the material information had already become a matter of public knowledge.

The trial developed that rumors of an ore discovery by TGS were flying around Canada during the early part of April and were being given wide circulation in the Canadian press. These rumors reached the New York press by April 11, on which day they were played up in both the New York Times and the New York Herald Tribune. At this point defendants Stephens and Fogarty agreed that a press release was necessary and this decision led to the issuance of the April 12 press release hereafter discussed. Fogarty also gave instructions that a reporter from The Northern Miner (an important Canadian publication on the mining industry in Canada), who had previously been invited to visit the Kidd 55 segment on April 21, be asked to come on April 13 instead.

The Northern Miner reporter, Ackerley, visited the property on April 13, interviewed defendants Mollison, Holyk and Darke, looked at the records of the drilling to that time, and prepared an article for publication. The article stated in part that "The Northern Miner can say that a major new zinc-copper-silver mine is definitely in the making, one that has all the earmarks of shaping into a substantial open pit operation * * * something in excess of 10,000,000 tons of ore is indicated." Ackerley delivered a copy of his proposed article to defendant Mollison in Timmins and it was agreed that it would not be published until cleared by Mollison. Defendants Mollison and Holyk read the article and though they felt that some of its conclusions were too optimistic, they considered it Ackerley's article and would not quibble with it. Defendant Mollison returned the article to The Northern Miner on the evening of April 15, and it was published in The Northern Miner's April 16 edition.

The Northern Miner had a small circulation in the United States—7,400 subscribers—including distribution in the New York area to 1,412 subscribers, who presumably received the paper on the morning of April 16. The Northern Miner also had a small newsstand circulation in New York, but the evidence fails to establish when the April 16 edition reached the newsstands. Reports of The Northern Miner article were telephoned and telexed from Toronto to some brokers in New York early on the morning of April 16 prior to the opening of the New York Stock Exchange.

The annual convention of the Canadian Institute of Mining and Metallurgy was held at the Queen Elizabeth Hotel in Montreal on April 13–15, attended by 500 to 600 representatives of the mining industry and of the business world, including some representatives from the United States. The rumors with respect to a copper discovery by TGS near Timmins were a leading subject of gossip in the corridors and bars of the hotel. The convention was attended by the Ontario Minister of Mines and his Deputy.

On the morning of April 15, defendants Mollison and Holyk met the Minister of Mines and his Deputy at the Montreal airport and flew them to Toronto, informing them during the course of the flight of the current developments on the Kidd 55 segment. The Minister indicated a desire to make a public statement and Mollison assisted him by drafting that statement. Mollison's draft concluded by saying that "the information now in hand * * * gives the company

confidence to allow me [the Minister] to announce that TGS has a minable body of Zn, Cu, Ag ore of substantial dimensions that will be developed and brought to production as rapidly as possible." Mollison and Holyk were under the impression that the Minister would issue the statement in Toronto over radio and television at 11:00 p. m. on the evening of April 15 and Mollison so informed defendants Stephens and Fogarty in New York.

The Minister made no announcement on the evening of the 15th, but on the morning of the 16th, at about 9:40 a. m., he delivered the statement drafted by Mollison to the press gallery at the Ontario Parliament in Toronto. Members of the press gallery included representatives of both the Canadian and American news media, but there was no evidence as to who was in the press gallery at the time.

The effect of the foregoing was that before the market opened on April 16, some brokers and some speculators had picked up information that TGS had made an ore discovery. However, no announcement had yet been made by TGS. Only the day before, defendants Stephens, Fogarty and Crawford were preparing the announcement which was to be made at 10:00 a. m. on April 16. They took steps to assure the attendance of appropriate representatives of the news media at the press conference where the announcement would be made. The officers of TGS knew about the rumors in Canada, The Northern Miner article and the pending announcement of the Ontario Minister of Mines. Had they thought that their effect was to make the material information public there would have been little purpose in making the arrangements for a press conference, and issuing a detailed announcement on April 16. The material information did not become public knowledge prior to TGS's official announcement. Therefore, insiders who purchased stock prior to TGS's announcement may not assert as a defense that the material information had already become a matter of public knowledge.

Turning now to the two defendants who purchased shares of TGS after 7:00 p. m. on April 9, 1964 and before 10:00 a. m. on April 16:

### Richard H. Clayton

Clayton was a geophysicist in the employ of TGS. His job was to conduct geophysical surveys, and he conducted such surveys on the Kidd anomaly. While he did not participate in the drilling, he spent a great deal of his time at Timmins and at the Kidd 55 segment, and the evidence establishes that he kept himself fully informed. He was in Timmins on April 12 and 13 and, according to Adelstein, he told Adelstein (on June 3, 1964) that he thought TGS had a mine when he learned the results of K–55–4. While Clayton denied making this statement, he testified at a pre-trial examination that he thought that, with the results of K–55–6, TGS had a potential ore body. By 7:00 p. m. on April 13, K–55–6 had been drilled to 949 feet, encountering substantial mineralization. Indeed, no further mineralization was encountered by K–55–6 after that time. On April 14 Clayton left for New York and was in TGS's New York office on April 15. He picked up the telephone at TGS's office in New York, called his broker in Toronto and ordered 200 shares of TGS stock. The broker executed the order on April 15 on the Midwest Stock Exchange in Chicago at $29\frac{3}{8}$.

It is clear that at the time of this purchase Clayton was in possession of material inside information which had not yet been made available to the public and that he used this information to his own advantage. In this proceeding by the Commission it is immaterial whether Clayton intended to deceive or to defraud anyone or whether he knew at the time that his purchase would violate Section 10(b) and Rule 10b–5. The Commission has established that Clayton violated these provisions in making his April 15 purchase.

Clayton contends that he is not subject to the jurisdiction of this court. He was employed by TGS, a United States corporation, and, according to his testimony, shuttled back and forth between Canada and New York on TGS business during the period from November 1963 to April 1964. His April 15 purchase was initiated by him while he was in New York in TGS's office. He placed his order with his Toronto broker by telephone from New York to Canada, employing a channel of interstate and foreign commerce. The transaction was consummated on the Midwest Stock Exchange in Chicago. He had previously purchased TGS stock, and on two occasions his orders were executed on the New York Stock Exchange. Though he placed his orders with a Toronto broker, all his purchases were effected on an American stock exchange. Clayton's telephone call from New York on April 15 brought about the purchase. Therefore, the court has subject matter jurisdiction. (Section 27 of the Act, 15 U.S.C. § 78aa; Ferraiola v. Cantor, 259 F.Supp. 842 (S.D.N.Y.1966)). Under Section 27 Clayton could be served wherever he was found and service outside of the United States has been sustained. Ferraiola v. Cantor, supra; S.E.C. v. VTR, Inc., 39 F.R.D. 19 (S.D.N.Y.1966); S.E.C. v. Briggs, 234 F.Supp. 618 (N.D. Ohio 1964); see Advisory Committee's Note to the 1963 revision of Rule 4 of Fed.R.Civ.P. reprinted at 31 F.R.D. 627, 630 (1962). Service upon Clayton by leaving the summons and complaint with his wife at his home in Timmins was valid. (Rule 4(d) (1), (e), (f), Fed.R. Civ.P.)

### David M. Crawford

Crawford is a lawyer who came with TGS on February 20, 1964, on which date he was appointed secretary of the Company and manager of its public and Government relations. He had not been informed as to the developments on the Kidd 55 segment. He read the rumor article in the New York Herald Tribune on April 11 while on his way to Houston to prepare for TGS's annual stockholders' meeting. He returned to New York either late on the 14th or early on the 15th of April, and on that day participated with Fogarty and a representative of Doremus & Co. in the preparation of the April 16 press release. The evidence establishes that by the evening of April 15 he was fully familiar with the contents of the announcement which was to be made the following morning. He spent the night in a room maintained by TGS at the Drake Hotel in New York City. About midnight he telephoned his broker in Chicago and ordered 300 shares of TGS for himself and his wife to be purchased as soon as the market opened the following day. During the night he decided to increase his order, and he telephoned his broker again at about 8:30 a. m. on April 16 to increase the order from 300 shares to 600 shares. The purchase was executed on the Midwest Stock Exchange on April 16 at $30\frac{1}{8}$ to $30\frac{1}{4}$.

Here again, while there is no evidence that Crawford intended to deceive or to defraud anyone, it is clear that he sought to, and did, "beat the news." There is no doubt that he believed that he could get the stock more cheaply if he bought before TGS's announcement was made. In so doing, he was utilizing material undisclosed information to his own advantage and violated Section 10(b) and Rule 10b–5.

(3) *10:00 a. m. April 16 to Close of Business on that Day*

Between the announcement and the close of business on April 16 defendants Coates and Lamont either purchased shares of TGS or recommended their purchase to others.

A regular meeting of the Board of Directors was held at TGS's offices at 9:00 a. m. on April 16. During the meeting defendant Stephens distributed copies of the announcement to be made to the press at the press conference called for 10:00 a. m. Stephens also told the Board that a statement regarding TGS's discovery had been issued in Toronto at 11:00 p. m. the previous evening by the Ontario Minister of Mines. At the con-

clusion of the Directors' meeting, representatives of the news media, over 22 in all, came into the Board Room. The announcement was made by Stephens, and they were given copies of the press release which Stephens, Fogarty and Crawford had prepared. The press release stated in part:

"Texas Gulf Sulphur Company has made a major strike of zinc, copper and silver in the Timmins area of Ontario, Canada.

\* \* \* \* \* \*

"Seven drill holes are now essentially complete and indicate an ore body of at least 800 feet in length, 300 feet in width and having a vertical depth of more than 800 feet.

\* \* \* \* \* \*

"This is a major discovery. The preliminary data indicate a reserve of more than 25 million tons of ore. The only hole assayed so far represents over 600 feet of ore, indicating a true ore thickness of nearly 400 feet.

\* \* \* \* \* \*

"Visual examination of cores from the other holes indicates comparable grade and continuity of ore.

"The ore body is shallow, having only some 20 feet of overburden. This means that it can easily be mined initially by the open pit method."

\* \* \* \* \* \*

Summaries of the announcement were carried over the internal news wire of Merrill Lynch, Pierce, Fenner & Smith at 10:29 a. m., and over the Dow Jones broad tape betwen 10:54 a. m. and 11:02 a. m.

### Francis G. Coates

■■ Coates was a Houston lawyer and a member of the Board of Directors of TGS. After reading the Herald Tribune article of April 11 he telephoned defendant Stephens from Houston and was told by Stephens that TGS did not have enough information to know what it had. Coates came to New York on April 15 and saw a draft of the proposed April 16 announcement that afternoon. On the 16th he attended the Directors' meeting

and remained for the press conference at which the announcement was made. The press conference started at 10:00 a. m. and lasted ten or fifteen minutes. Shortly before 10:20 a. m. Coates left the meeting room and telephoned his son-in-law, Haemisegger, a broker in Houston. He told Haemisegger of TGS's discovery and ordered 2,000 shares of TGS stock for the accounts of four family trusts of which he was a trustee but not a beneficiary. Haemisegger executed the order at prices from 31 to 31⅝ on the New York and Midwest Exchanges. Haemisegger immediately imparted the information he had received from Coates to four of his customers, and they, as well as Haemisegger himself, purchased a total of 1500 shares of TGS stock at prices ranging from 31¼ to 35.

Coates lost no time in telephoning his son-in-law in order to purchase TGS stock for his family trusts. Coates could not, as could Lamont when he telephoned Hinton at the Morgan Guaranty Trust Company just before 10:40 a. m., assume "without thinking about it, that the [ore discovery] was already a matter of public information. \* \* \*" *Cady, Roberts,* supra, at 917. The announcement had been made, however, and it has been the generally accepted rule that it is the making of the announcement that controls. For example, the Commission in *Cady, Roberts* found violations of Section 10(b) and Rule 10b–5 for purchases made "during the time when respondents should have known that the board of directors \* \* \* was taking steps to make the information publicly available but *before it was actually announced.*" *Cady, Roberts,* supra, at 915. (Emphasis supplied.) Coates, an experienced corporate lawyer, testified that he believed that the standard in the market place was that once the announcement is made, insiders were free to purchase stock or to recommend it to others.

It may be, as the Commission contends, that a more effective rule should be established to preclude insiders from acting on information after it has been announced but before it has been absorbed

by the public. Perhaps such a rule should extend not only to corporate insiders but to others who may be in a position to take unfair advantage of the stockholders. What of a representative of the news media who, upon hearing the announcement, calls his broker before he calls his office? What of a wire house which has an inside track in getting the information to its registered representatives and to its customers? (The April 16 announcement went out over Merrill Lynch's news wire to its 145 offices half an hour before it went out over the Dow Jones ticker.) Should the representatives of the news media and the wire houses be subjected to such a rule since they are in possession of material information which the average stockholder has not had an opportunity to absorb? These examples are offered merely to illustrate the problems that arise if the present practice is to be changed.

The Commission took the position, on summation, that it is for the courts to fix a reasonable waiting period after an announcement is made, during which insiders cannot purchase stock, so that the announcement can first be absorbed by the public. In other words, it seems to be the Commission's position that a fairer practice than now exists should be evolved through court decisions. This could only lead to uncertainty. A decision in one case would not control another case with different facts. No insider would know whether he had waited long enough after an announcement had been made. He would be subject to suit by the Commission (and to private suits brought by others riding on the Commission's coattails).

The Commission has not supplied, nor has the Court found, decisions specifying a waiting period after a corporate announcement is made. After this action was instituted, Cary, the former chairman of the Commission, and Fleischer, his former executive assistant, discussed a waiting period in policy terms.[12] If a waiting period is to be fixed, this could be most appropriately done by the Commission, which was established by Congress with broad rule-making powers. Should the Commission determine that it lacks authority to fix a waiting period, authority should come from Congress rather than from the courts.

Since TGS's announcement had been made when Coates telephoned Haemisegger, he did not violate Section 10(b) or Rule 10b–5.

### Thomas S. Lamont

▮ Lamont was a director of TGS. He was also a director of Morgan Guaranty Trust Company and a member of its Executive Committee and its Trust and Investment Committee. Lamont testified that he first heard of the exploration on the Kidd 55 segment on April 10 when defendant Stephens telephoned him about the rumors in Canada, and Lamont

---

12. In a symposium held on November 22, 1965, former Commission Chairman Cary stated:

"Directly related is the question when insiders can trade. Again, I doubt whether we can supply a definitive answer. In general, the answer may be: not prior to the time the news has been absorbed by the market. The President of the New York Stock Exchange has suggested thirty days, beginning one week after the distribution of a comprehensive annual report. * * * This line, I think, is strict; it goes beyond law, and is really a policy doctrine that he has enunciated. It goes beyond what a lawyer might advise." (Symposium, "Insider Trading in Stocks," The Business Lawyer, Vol. XXI, 1009, 1014–1015 (1966).)

Fleischer has written:

"As a general principle, an insider might be held to violate rule 10b–5 whenever he trades before the effect of the news in question has been absorbed by the market.

\* \* \* \* \*

"As a matter of corporate practice, it would be advisable for any insider to forego any trading for, say, an arbitrary twenty-four hour period after important news is released to the public." (Fleischer, "Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding," 51 Va.L.Rev. 1271, 1291 (1965).)

advised Stephens to ignore them unless they reached the New York press. Stephens informed Lamont that the exploration was "at the prospect stage."

Thereafter, Lamont heard rumors from friends and read the article which appeared in the Herald Tribune on April 11, and TGS's April 12 press release as reported in the press. On April 13 or 14 he had a conversation about the rumors with Hinton, the Executive Vice President of Morgan Guaranty Trust Company. Lamont told Hinton that he knew nothing more than had appeared in the press. On April 15 Lamont was informed by Stephens that a press conference would follow the regular Directors' meeting scheduled for the morning of the 16th. Lamont attended the Directors' meeting and read the press release, and attended the press conference at which the announcement was made.

Following the announcement, and while he was still at the TGS office, Lamont telephoned Hinton at about 10:-40 a. m. and told Hinton that good news about TGS had come out or would be shortly coming out on "the tape." Immediately following Lamont's telephone call, Hinton telephoned his trading department and was informed that TGS stock was active and up three points. Hinton thereupon placed an order for 2,000 shares of TGS for the account of the Bank's customer, the Nassau Hospital, which order was executed at about 10:41 a. m. Thereafter, Hinton placed further orders for purchases of TGS stock for customers of the Bank, including pension trusts, purchasing a total of 10,000 shares at prices ranging from 32⅝ to 34. At about 12:30 p. m. on April 16 Lamont ordered the purchase of some 3,000 shares of TGS for himself and members of his family, which orders were executed at a price of 34½.

Lamont's telephone call to Hinton was made some 20 minutes after Coates telephoned his son-in-law, both calls being made after the announcement. His own purchases were ordered more than two hours after the announcement.

For the reasons previously stated with respect to defendant Coates, Lamont did not violate Section 10(b) or Rule 10b-5, since the announcement had been made.[13]

### Stock Options issued by TGS to certain defendants on February 20, 1964.

■ Five of the defendants—Stephens, Fogarty, Kline, Mollison and Holyk—are charged with violating Section 10(b) and Rule 10b-5 by accepting stock options voted to them on February 20, 1964 by the Directors' Committee to Administer the Restricted Stock Option Incentive Plan (the Committee).[14] The Commission contends that these defendants violated the statute and the rule because they had knowledge as to the drilling results of the first hole, K-55-1, which knowledge they failed to disclose to the Committee or to the Board of Directors prior to accepting their options.

TGS's restricted Stock Option Incentive Plan (the Plan) was inaugurated in 1961 with the approval of its stockholders.[15] Three non-management direc-

---

13. Since no violations of Section 10(b) or Rule 10b-5 have been found as to those defendants who recommended TGS stock to others, it is not necessary to consider whether an insider who violates the Statute or the Rule may be liable for purchases made by his "tippees."

14. The stock options accepted by these defendants were as follows:

| | | |
|---|---|---|
| Stephens | for 12,800 | shares |
| Fogarty | " 7,300 | " |
| Kline | " 4,300 | " |
| Mollison | " 4,300 | " |
| Holyk | " 2,000 | " |

Stock options were granted to 21 other officers and employees at the same time, and the total number of shares covered by stock options granted on February 20, 1964 was 89,950.

15. The Plan provided that the options would run for ten years from the date of issue, subject to automatic termination in the event of the death or termination of employment of the recipient. At its meeting, the Committee recommended that the plan be amended to reduce the option period from ten years to five years, to become effective on passage of pend-

tors, John H. Hill, Leslie M. Cassidy and defendant Coates, were the members of the Committee appointed by the Board. At the meeting of the Committee held on February 20, 1964, two members, Hill and defendant Coates, were present. The minutes disclose that the Board of Directors at its meeting on March 16, 1961 had directed that no shares should be optioned to any employee earning less than $24,000 annually. The Committee granted stock options to 21 officers and employees earning $24,000 or more per annum (including defendants Stephens, Fogarty, Mollison and Kline) and recommended to the Board the granting of stock options to five employees (including defendant Holyk) whose annual salaries were in the $15,000 to $21,000 range, which recommendation was approved by the Board at its meeting later on the same day.

The use of stock option plans is a commonly accepted device to provide incentive to officers and employees. Restricted stock options of the type authorized by the stockholders of TGS are not uncommon in publicly-owned companies. As pointed out by Judge Weinfeld in Kornfeld v. Eaton, 217 F.Supp. 671, 677 (S.D.N.Y.1963), aff'd, 327 F.2d 263 (2d Cir. 1964):

" * * * Restricted stock options of the type here under consideration have their genesis in express approval by the stockholders of the corporation and are intended to enable its employees to benefit from an increase in the market value of the security. The corporate purpose is satisfied through the optionee's services and his efforts to further its interests. Indeed it is in the corporate economic interest that its employees have an investment stake in it. Congress itself has recognized

the salutary purpose of such plans by extending them favorable tax treatment."

The Committee necessarily relied on information furnished it by the higher echelon of TGS's management. (which would include defendants Stephens and Fogarty, but not Mollison, Kline or Holyk). The Committee did not inquire of the recipients what special knowledge they might have as to various phases of TGS's business as it was entitled to rely on the information furnished by the management.

The record shows that at the time they accepted their stock options, each of the five defendants (except Kline) knew of the situation on the Kidd 55 segment as it existed at the time. Since the land acquisition program had not been completed they had been instructed not to divulge this information. Indeed, on February 20, 1964, neither the Board of Directors nor the Committee had been informed.[16]

Defendant Kline was informed by defendants Stephens and Fogarty at lunch in November 1963 that TGS was conducting explorations in the Timmins area and that the completion of the first drill hole was a favorable development; that it was on the boundary of the TGS property and that TGS was interested in acquiring additional property. He knew no details and his only information came from his superiors. Defendants Mollison and Holyk knew the results of K–55–1 and had reported these results to their superior, defendant Fogarty. Kline, Mollison and Holyk had no duty to inform the Committee of information already known to their superiors since they could assume that such information would be reported to the Committee by the management.

---

ing Congressional legislation to that effect; that such amendment apply to the options granted on February 20, 1964; and further, that the options issued on February 20, 1964 could not be exercised while any previous qualified or restricted option was held by the optionee. The options provided that the optionees could exercise up to 40% at any time after 18

months, 70% at any time after three years and 100% at any time after four years.

16. The Board was not informed until its meeting on April 16, 1964, when the Directors were given copies of the press release which was issued following the meeting.

Defendants Stephens and Fogarty as President and Executive Vice President were management. Both were also Directors and potential recipients of stock options. They were under a duty to inform the Committee of material information affecting the issuance of the stock options. The Plan required that the option price be at least 95% of the fair market value of the stock on the date on which the options are to be granted. The Committee fixed the option price as "the average of the highest and lowest prices of the Company's stock on the New York Stock Exchange during February 20, 1964." Therefore, included in Stephens' and Fogarty's duty of disclosure was any material information bearing on the market value of TGS stock on that date.

■■■ A corporate officer may be guilty of fraud if he withholds material information from his company to his own advantage. New Park Mining Co. v. Cranmer, 225 F.Supp. 261 (S.D.N.Y. 1963). Therefore, if the information known to defendants Stephens and Fogarty would have substantially affected the price of the TGS stock on the New York Stock Exchange, their receipt of stock options without disclosure to the Committee could have constituted a fraud on TGS. A stock option is a security (the Act, Section 3(a) (10); 15 U.S.C. § 78c (a) (10)), so that such a fraud would have come within the ambit of Section 10(b) and Rule 10b–5. See Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964).

On February 20, 1964, defendants Stephens and Fogarty knew (1) that K–55–1 had been completed; (2) that the drill core had been assayed and that the assay certificates showed substantial mineralization; and (3) that the land acquisition program was in progress and that further drilling would await its completion. However, the Court has already determined that the information as to developments on the Kidd 55 segment were not material until 7:00 p. m. on April 9, some seven weeks later. The same definition of materiality applies. Since the information was not material, defendants Stephens and Fogarty were not required to disclose it to the Committee. Hence, defendants Stephens and Fogarty were not guilty of fraud or deception in failing to furnish the information. In view of the land acquisition program, the security measures which they established were for the benefit of the Company and its stockholders.[17]

In accepting the stock options granted to them on February 20, 1964, defendants Stephens, Fogarty, Kline, Mollison and Holyk did not violate Section 10(b) or Rule 10b–5.

The April 12, 1964 Press Release

On Sunday, April 12, 1964, at about 3:00 p. m., TGS issued a press release, the substance of which appeared in the Monday morning newspapers. The text of the release stated in part:

"NEW YORK, April 12—The following statement was made today by Dr. Charles F. Fogarty, executive vice president of Texas Gulf Sulphur Company, in regard to the company's drilling operations near Timmins, Ontario, Canada. Dr. Fogarty said:

" 'During the past few days, the exploration activities of Texas Gulf Sulphur in the area of Timmins, Ontario, have been widely reported in the press, coupled with rumors of a substantial copper discovery there. These reports exaggerate the scale of operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.

" 'The facts are as follows. TGS has been exploring in the Timmins area for six years as part of its overall search in Canada and elsewhere for various minerals—lead, copper, zinc,

---

17. After the Commission instituted this action, the Board of Directors, on July 15, 1965, ratified the issuance of the stock options to Kline, Mollison and Holyk. Stephens and Fogarty surrendered to TGS the options which they received, and these options have been cancelled.

etc. During the course of this work, in Timmins as well as in Eastern Canada, TGS has conducted exploration entirely on its own, without the participation by others. Numerous prospects have been investigated by geophysical means and a large number of selected ones have been core-drilled. These cores are sent to the United States for assay and detailed examination as a matter of routine and on advice of expert Canadian legal counsel. No inferences as to grade can be drawn from this procedure.

" 'Most of the areas drilled in Eastern Canada have revealed either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies.

" 'Recent drilling on one property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.

" 'The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project.' "

\* \* \* \* \* \*

The Commission argues that at the time the press release was issued, TGS knew that it had discovered a copper mine on the Kidd 55 segment and that the press release was materially misleading in characterizing this discovery as a "prospect" and in stating that "any statement as to size and grade of ore would be premature." For these reasons the Commission contends that the press release violated Section 10(b) and Rule 10b–5.

[30] TGS denies that the press release was false or misleading. Moreover, TGS contends that no violation of Section 10(b) or Rule 10b–5 is made out by the Commission since the press release was not issued "in connection with the purchase or sale of any security." However, the issuance of a false and misleading press release may constitute a violation of Section 10(b) and Rule 10b–5 if its purpose is to affect the market price of a company's stock to the advantage of the company or its insiders. Freed v. Szabo Food Serv., Inc., CCH FED.SEC.L.REP. ¶ 91,317 (N.D.Ill.1964). The phrase "in connection with the purchase or sale of any security" has been broadly construed "to carry out the intent of the Act, which is designed to protect investors against fraud." Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965); Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y.1964).

 During the first week of April, rumors of a copper discovery by TGS on the Kidd 55 segment were circulating in Canada. These rumors intensified, and on April 9 Toronto newspapers reported that TGS had discovered "one of the largest copper deposits in North America," "a major copper strike." On April 10, defendant Stephens telephoned defendant Lamont seeking his advice as to what action TGS should take with respect to the rumors. Lamont advised that TGS should take no action unless the rumors reached the New York press or until TGS had sufficient information available to issue an appropriate press release.

On Saturday morning, April 11, 1964, defendant Stephens, while at his home in Greenwich, Connecticut, read the articles appearing in the New York Times and the New York Herald Tribune. The Herald Tribune article announced that TGS had "the biggest ore strike since gold was discovered more than 60 years ago in Canada \* \* \* a bed of copper sulphide 600 feet wide with a possible over-all copper return of 2.87% through most of its width."; that TGS had four drill rigs in operation with four

more to go into operation the following week; and that the richness of the copper was so great that it had been flown out of Canada to be assayed.

Stephens telephoned defendant Fogarty at the latter's home in Rye, New York and told him about the articles. Fogarty read the articles and called Stephens back. Fogarty testified that he and Stephens "were quite upset * * * because certainly they [the articles] were full of exaggerations and what I considered to be erroneous statements." Stephens advised Fogarty that TGS should issue a press release to clarify the rumors, referring to his April 10 conversation with defendant Lamont. Stephens asked Fogarty to contact Carroll of Doremus & Co., the Company's public relations firm, who also lived in Rye. Fogarty did so, and Carroll agreed that TGS should issue a press release.

At about 1:00 p. m. on Saturday afternoon, April 11, Fogarty telephoned defendant Mollison at his home in Greenwich, Connecticut, and asked for a review of the situation at the Kidd 55 segment. At about 5:00 p. m. he went to Mollison's home to discuss the matter further. Mollison had been on the Kidd 55 segment on the morning of April 10 and had been advised by defendant Holyk as to the drilling results to 7:00 p. m. on April 10. At that time drill holes K–55–1, K–55–3 and K–55–4 had been completed; drilling of K–55–5 had started on Section 2200 S and had been drilled to 97 feet, encountering mineralization on the last 42 feet; and drilling of K–55–6 had been started on Section 2400 S and had been drilled to 569 feet, encountering mineralization over the last 127 feet.

In reporting the situation on the Kidd 55 segment, Mollison told Fogarty that the only known mineral occurrences in the area had been at Kamkotia and that these consisted of a series of small disconnected sulphide masses. Mollison advised that it was too early to state what TGS had and "it was impossible at that time * * * to understand the structure, to make the projections from one hole to another." Fogarty went home and

drafted notes for a press release which he took to Carroll's house so that they could be put in shape by Carroll for release on Sunday, the following day. He had telephoned defendant Huntington, one of TGS's lawyers, reading his notes to him. Huntington made one or two suggestions and advised Fogarty that he thought the release would be all right legally.

On Sunday morning, April 12, Fogarty telephoned Mollison to see if he had any additional information, and instructed Mollison to return with Holyk to Timmins as soon as possible to "move things along." Fogarty and Carroll then completed the final draft of the press release at Carroll's house. Fogarty telephoned Stephens and read the final draft to him, Stephens asking certain questions and making minor changes. Stephens instructed Fogarty to have the release issued as promptly as possible so that it would be on the wires on Sunday afternoon.

From the foregoing, it is apparent that the purpose of the April 12 press release was an attempt to meet the rumors which were circulating with respect to the Kidd 55 segment. There is no evidence that TGS derived any direct benefit from the issuance of the press release or that any of the defendants who participated in its preparation used it to their personal advantage. The issuance of the release produced no unusual market action. In the absence of a showing that the purpose of the April 12 press release was to affect the market price of TGS stock to the advantage of TGS or its insiders, the issuance of the press release did not constitute a violation of Section 10(b) or Rule 10b–5 since it was not issued "in connection with the purchase or sale of any security."

However, even if it had been established that the April 12 release was issued in connection with the purchase or sale of any security, the Commission has failed to demonstrate that it was false, misleading or deceptive. The significance of the drilling results known to TGS by 7:00 p. m. on April 10 was the

subject of detailed and conflicting testimony at the trial. Adelstein defined proven ore and probable ore. His definitions were substantially the same as the definitions used in the General Rules and Regulations under the Securities Act of 1933, Appendix I, Form 1–A, Notification Under Regulation A, Schedule I, Item 8A(c), which provide:

"The term 'proven ore' means a body of ore so extensively sampled that the risk of failure in continuity of the ore in such body is reduced to a minimum. The term 'probable ore' means ore as to which the risk of failure in continuity is greater than for proven ore, but as to which there is sufficient warrant for assuming continuity of the ore."

Based on these definitions and the drilling done to 7:00 p. m. on April 10, Adelstein was of the opinion that TGS could have calculated 8.33 million tons of proven ore. Pennebaker, the other Commission expert, was of the opinion that TGS could have calculated 6.2 million tons of proven ore. Both of the Commission experts stressed that the drilling showed substantial mineralization in the cores and substantial copper mineralization on the eastern edge of the anomaly. Since they could make estimates as to the size and grade of ore on the basis of information to 7:00 p. m. on April 10, the Commission contends that the use of the word "prospect" in the April 12 press release was misleading. Adelstein defined a "prospect" as a property where there is no assurance that commercially mineable reserves exist.

The opinions of Adelstein and Pennebaker were contradicted by Forrester, Park, Wiles, Walkey, Lacy and McLaughlin, independent experts called by TGS (see footnote (9)).

TGS's experts were unanimously of the opinion that at 7:00 p. m. on April 10 the Kidd 55 segment was still a prospect and that no estimates as to proven or probable ore could be made. They all agreed that the April 12 press release accurately set forth the situation as it was known at the time. None thought

that TGS could have estimated proven ore, and the Commission's expert, Pennebaker, agreed that this was a matter on which there could be differences of opinion. Defendants' experts testified that on the basis of the drilling to that time there was no assurance of continuity in the mineralized zone and that, without further drilling, the results of one hole could not be correlated with the results of others.

The Commission contends none the less that the press release was misleading and deceptive because the defendants who prepared the release believed that TGS had a mine. The Commission points to the fact that drilling of K–55–8, the mill test hole, was commenced on April 11, and must have been ordered by the defendants at an earlier time. Both Adelstein and Pennebaker testified that a company does not drill a mill test hole on a "prospect."

Park, Lacy and Forrester found nothing unusual in this procedure, and Wiles testified that it was usual to begin collecting metallurgical samples as the drilling progresses. With a direct conflict in testimony between the Commission's and defendants' expert witnesses, it cannot be concluded that instructions to drill K–55–8 established that TGS knew that the Kidd 55 segment was no longer a "prospect."

The Commission also points to the Northern Miner article which was drafted in Timmins on April 13. Even if it is assumed that Mollison, Holyk and Darke suggested the contents of that article to Ackerley, this would not establish that the April 12 press release was false or deceptive. Using the Commission's figures, over 30% of the relevant drilling was done between 7:00 p. m. on April 10 and 7:00 a. m. on April 13. K–55–5 was drilled an additional 507 feet; K–55–6 was drilled an additional 375 feet; drilling of K–55–7 was commenced on April 12 on Section 2000 S and was drilled to a length of 146 feet by 7:00 a. m. on April 13. The defendants are to be judged on the facts known to them when the April 12 press release was issued.

Mollison and Holyk were not at the site but were in or near New York while the release was being prepared. There is no evidence that the drilling results after 7:00 p. m. on April 10 were known to the framers of the April 12 press release, so there is no more reason for charging TGS with this knowledge than with knowledge of the statement drafted by Mollison for the Ontario Minister of Mines on April 15, or with knowledge of the information that was available to TGS when it made its announcement on April 16.

Moreover, the circumstances under which the April 12 release was prepared indicate that defendants Fogarty and Mollison were under considerable pressure. If they said too much, they would have been open to criticism and possible liability if it turned out that TGS had not discovered a commercial mine. If they said too little and later announced a mine, they subjected themselves to the charge that their press release was misleading or deceptive—and, indeed, this is what has happened. If they had announced the drilling results in terms of number of drill holes, footage drilled and mineralization intersected, they would have encouraged the rumor mill which they were seeking to allay. Perhaps they should have waited until they could have obtained more probative information before issuing a press release, particularly since developments were breaking so rapidly. However, as above stated, TGS must not be judged by hindsight. In seeking the advice of Mollison, the head of TGS's exploration group, in consulting with TGS's public relations firm, and in clearing the release with one of TGS's lawyers, Stephens and Fogarty exercised reasonable business judgment under the circumstances. While, in retrospect, the press release may appear gloomy or incomplete, this does not make it misleading or deceptive on the basis of the facts then known.[18]

Accordingly, in issuing the April 12 press release TGS did not violate Section 10(b) or Rule 10b–5.

### Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law (Rule 52(a), Fed.R.Civ.P.).

There appearing no just reason for delay, the Clerk is directed to enter judgment dismissing the complaint against defendants Texas Gulf Sulphur Company, Charles F. Fogarty, Richard D. Mollison, Walter Holyk, Kenneth H. Darke, Thomas S. Lamont, Francis G. Coates, Claude O. Stephens, John A. Murray, Earl L. Huntington and Harold B. Kline (Rule 58 (1), Fed.R.Civ.P.).

Defendants Richard H. Clayton and David M. Crawford are found to have violated Section 10(b) of the Act and Rule 10b–5. In accordance with the agreement between the parties, the Commission may notice a hearing to determine the remedy to be accorded with respect to these two defendants.

It is so ordered.

---

18. That the drilling results to 7:00 p. m. on April 9 have been held to be material information does not lead to the conclusion that the Kidd 55 segment was either a mine or a prospect twenty-four hours later. It means only that insiders could not use this material information to their own advantage prior to its disclosure to the public.